D. Tammy COUTU, Plaintiff–Appellant,

v.

MARTIN COUNTY BOARD OF COUNTY COMMISSIONERS, Robert H. Oldland, Defendants–Appellees.

No. 93–4471.

United States Court of Appeals, Eleventh Circuit.

March 16, 1995.

D. Tammy Coutu, pro se.

George P. Roberts, Jr., Tamara A. McNierney, Roberts & Reynolds, P.A., West Palm Beach, FL, for appellees.

Before KRAVITCH and HATCHETT, Circuit Judges, and CLARK, Senior Circuit Judge.

PER CURIAM:

Plaintiff D. Tammy Coutu, a Mexican–American, brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a)(1) and 2000e–3(a), against her former employer, Martin County Board of County Commissioners, and Robert Oldland, the County Administrator. Coutu contends that defendants violated Title VII by terminating her employment and by declining to rehire her when another position with the County became available. Specifically, she alleges that defendants (1) discriminated against her because of her national origin and (2) retaliated against her because she filed a grievance against Oldland and protested allegedly unlawful discriminatory practices during her tenure with the County.

By stipulation of the parties, the case was tried before a jury. At the close of Coutu's case, the district court granted a directed verdict in favor of Oldland,[1] but reserved ruling on defendants' motion for a directed verdict in favor of the Board. After hearing all of the evidence presented by the parties,

---

1. The district court granted this verdict in favor of Oldland because Coutu had failed to file an EEOC charge against him. (R9–776). Coutu does not challenge this ruling on appeal.

the district court found that the Board had demonstrated that Coutu was terminated as part of a reduction in force necessitated by County budgetary constraints and that Coutu had failed to prove that this legitimate, non-discriminatory reason was pretextual. Accordingly, the district court granted a directed verdict in favor of the Board. For the reasons explained below, we affirm.

## FACTS

Prior to 1983, Martin County did not have a centralized personnel section; each department did its own advertising, recruitment, and hiring of personnel. In early 1983, Robert Oldland, the County Administrator, reorganized all of the departments in the County and centralized the personnel responsibilities within his office. To handle these centralized personnel responsibilities, he requested and received Board approval for two new positions: a Personnel Assistant to the County Administrator, and a secretary. Oldland initially assigned the centralized personnel responsibilities to Sue Whittle, the Executive Assistant to the County Administrator, pending hiring for the two new positions.[2] In November 1983, Oldland hired the plaintiff, Tammy Coutu, to fill the Personnel Assistant position, and the centralized personnel responsibilities passed to her.[3]

The new secretarial position was also filled, so that Coutu had one secretary to help her with the personnel responsibilities.[4] These responsibilities included establishing centralized personnel records; recruiting, screening, and testing potential employees;

developing employee evaluation procedures, disciplinary programs, and grievance procedures;[5] revising the personnel manual; preparing a job description manual;[6] and implementing equal employment opportunity and affirmative action compliance programs.[7] As Personnel Assistant, Coutu reported directly to Oldland.[8]

Coutu did not have a good working relationship with either Oldland or Whittle, Oldland's executive assistant.[9] Several factors appear to have contributed to these poor working relationships. First, Coutu and Oldland had differing views of Coutu's job responsibilities and priorities. Coutu repeatedly testified that she was hired to "stop discrimination."[10] She saw herself as an employee advocate whose job it was to root out problems. Oldland believed that Coutu devoted too much time to her role as an employee advocate.[11] In his opinion, Coutu's number one job priority was the revision of the personnel manual,[12] a job that Coutu never completed.[13] Second, Coutu felt that she was overworked and that she should have been provided with additional assistance to perform her duties.[14] Third, Oldland was ill during his tenure with the County.[15] According to Coutu, his illness caused him to have mood swings; sometimes he was jolly and sometimes he was hostile.[16] Coutu testified that when Oldland was in a good mood, he "was good to work with"[17] and Coutu "was his best buddy."[18] Coutu had problems working with Oldland, however, when he was in a bad mood. She testified that she

2. R9–787–88.

3. R8–537–41.

4. R7–366.

5. R8–542–43.

6. R8–606.

7. R6–243, 247–49. At the suggestion of a federal equal employment opportunity officer, Oldland took responsibility for the affirmative action compliance program himself in October of 1985. R8–615–24.

8. R8–590.

9. R7–513–14; R8–596.

10. R6–234, 246, 250, 327.

11. R6–189.

12. R9–734.

13. R9–805.

14. R7–366, 520.

15. R9–790.

16. R7–375, 513–14.

17. R8–577.

18. R7–514.

was not the only one who had such problems: "He had the mood swings, and I'm sure Mrs. Whittle had the same problem with him." [19]

Oldland gave Coutu two performance reviews, one in early 1985 and one in early 1986.[20] In the 1985 review, Oldland commented that Coutu needed to improve relationships with her co-workers and with supervisory personnel with whom she worked; that she needed to improve the manner in which she prioritized tasks, as she spent too much time on employee advocacy and insufficient time on required management tasks; and that she needed to complete tasks on schedule.[21] Coutu did not agree with *any* of the criticisms of her work contained in the evaluation;[22] she also disagreed with the performance rating Oldland gave her, and she wrote a three-page memorandum expressing her dissatisfaction with the rating.[23]

In Coutu's 1986 performance review, Oldland commented that Coutu was unable to accept constructive criticism; that, while she had improved her work scheduling, she still needed to prioritize her tasks and timely complete projects, particularly the personnel manual; and that she needed to develop personnel systems to reduce paper flow.[24] Again, Coutu did not agree with the criticisms in the performance review; she viewed them as "minor little things and I would have been able to take care of them properly and efficiently if I had had the requested additional help that I tremendously needed." [25] Coutu also disagreed with the rating she received in the 1986 evaluation. After Oldland declined to change this rating, Coutu filed a grievance.[26]

In her written grievance, Coutu contended that she was "justified in requesting a six percent merit increase plus the five percent salary increase requested on 1/8/86 for additional duties and responsibilities." [27] She also alleged racial discrimination, although she gave no specific examples of discrimination.[28]

In accordance with County policy, a grievance hearing was held on July 16, 1986.[29] Notwithstanding Coutu's written allegations, Coutu's lawyer specifically declared at the beginning of the hearing that the grievance did *not* involve racial discrimination. Indeed, Coutu presented no evidence of racial discrimination at the hearing; she contended only that she worked hard and deserved a better rating than Oldland had given her.[30] The five-member grievance committee denied Coutu's grievance, by a vote of four to one.[31]

During her trial testimony, Coutu repeatedly complained about numerous alleged irregularities in her grievance hearing. For example, she complained that the administration hand-picked her grievance committee, rather than drawing names from a hat, as was the usual practice. She also complained that her grievance hearing was held in the committee chambers, rather than in a back conference room, as was the usual practice.[32] Coutu's testimony eventually revealed that the irregularities about which she complained were due to her unique position as Personnel Assistant and were entirely justified. County policy provided that Coutu, as Personnel Assistant, would sit as the chairperson of any grievance committee, and that the committee would consist of Coutu, another member of

19. R8–577.

20. R7–511.

21. R8–587.

22. R8–593–94.

23. R7–512.

24. R8–636–37.

25. R8–638.

26. R7–512–13.

27. R7–519.

28. R7–515, 519.

29. R8–668.

30. R6–279. Although Coutu testified at trial that her lawyer did not follow her instructions during the grievance hearing, she admitted that she did nothing during the hearing to make this known. R8–680–81.

31. R6–286.

32. R6–317–20.

the administration, and three salaried employees. The policy did not specify how the three salaried employees were to be chosen, or where the grievance hearing was to take place.[33] Because Coutu obviously could not serve as chairperson of her own grievance committee, Oldland selected another chairperson, who opted to appoint the members of the committee, rather than to draw names from a hat as Coutu did. This chairperson expressed his willingness to reconsider any appointment upon objection.[34] Coutu objected to one person who was appointed to the committee; consequently, that person was replaced by a person to whom Coutu did not object,[35] and Coutu did not object to the other three appointments to the committee.[36] As to the location of the hearing, Coutu admitted that the back conference room that she used when she served as chairperson held only 12 people, that members of the press and public were present at her grievance hearing, and that the large number of people present was "a good logical reason" to hold the hearing in the committee chambers.[37]

In the summer of 1986, contemporaneous with Coutu's grievance proceedings, the County was suffering budgetary constraints; it had lost approximately $600,000.00 in revenue for 1986 due to the discontinuation of federal revenue sharing. In an effort to compensate for the revenue loss, the County placed a freeze on hiring and did not buy any new equipment or expand services.[38] In addition, Oldland formulated a proposal for reorganizing certain County jobs. He suggested eliminating the position of Personnel Assistant to the County Administrator and the position of General and Public Service Director by merging these two positions into the existing Assistant County Administrator position. The merger of these three positions would save the County $56,000.00 a year. Oldland also suggested eliminating an electrician position and a carpenter position. The Board approved Oldland's proposed changes.[39] Thus, Coutu's position as Personnel Assistant to the County Administrator was eliminated due to budgetary constraints, and she was subsequently terminated.[40]

At the time the Board approved Oldland's reorganization plan, the position of Assistant County Administrator was vacant. Sue Whittle, then Executive Assistant to the County Administrator, was chosen to fill the position of Assistant County Administrator. Thus, Whittle took over the functions of the Personnel Assistant to the County Administrator, as well as the functions of the General and Public Service Director.[41]

When Whittle assumed the position of Assistant County Administrator, her former position as Executive Assistant to the County Administrator became available. Upon learning of the opening, Coutu applied for the Executive Assistant position.[42] Kathy Leahy, a County employee who had served for a number of years as secretary to the Chairman of the Board of County Commissioners, also applied and was ultimately chosen for the position over Coutu.[43] The trial testimony established that Leahy was qualified for the position; in fact, as secretary to the Chairman of the Board, she had handled responsibilities very similar to those that she would handle as Executive Assistant.[44] Moreover, Coutu admitted that Leahy had seniority over her.[45] Coutu also admitted that the Executive Assistant was the County Administrator's "right-hand person," such that a good working relationship between the

33. R8–639–41.

34. R8–652.

35. R8–662.

36. R8–653.

37. R8–677–78.

38. R9–793–94.

39. R7–415–17, 521–22; R9–758, 796–97, 814.

40. R9–753–54.

41. R9–757–58.

42. R7–437–38.

43. R7–459.

44. R9–785–86, 807.

45. R8–703.

two was essential.[46] Thus, Coutu's poor working relationship with Oldland rendered her a less than acceptable candidate for the position.

## DISCUSSION

Coutu raises two claims: national origin discrimination and retaliation. We discuss these claims separately.

### National Origin Discrimination

■ Coutu contends that the Board discriminated against her based on her national origin by terminating her employment and by declining to rehire her for the Executive Assistant position. In order to prove discriminatory treatment in violation of Title VII, a plaintiff must first establish a prima facie case of discrimination. Absent direct evidence of discrimination, a plaintiff in a termination case establishes a prima facie case by showing (1) that she is a member of a protected class, (2) that she was qualified for the position held, (3) that she was terminated, and (4) that she was replaced by a person outside the protected class.[47] When the plaintiff is terminated through a reduction in force, the prima facie case is modified somewhat, such that the plaintiff must show (1) that she is a member of a protected class, (2) that she was terminated, (3) that she was qualified for another position at the time of termination, and (4) that the employer intended to discriminate in failing to consider the plaintiff for another position.[48] In a case alleging failure to hire, the plaintiff must establish a prima facie case by showing (1) that she is a member of a protected class, (2) that she applied and was qualified for the job, (3) that despite her qualifications, she was rejected, and (4) that the position remained open or was filled by a person outside the protected class.[49]

■ In this case, we express some doubt as to whether Coutu established a prima facie case of national origin discrimination. As to her termination, Coutu failed to prove that she was replaced by someone outside the protected class; indeed, she was not replaced at all, as her position was eliminated. If Coutu's termination is considered a reduction in force, there is some question as to whether Coutu was qualified for another position; the only position she sought was that of Executive Assistant, and her poor working relationship with Oldland may have disqualified her for that position. Nevertheless, we will, as did the district court, assume without finding that Coutu established a prima facie case of national origin discrimination.

A prima facie case of discrimination raises the inference that discriminatory intent motivated the adverse employment action. The employer may rebut this inference by "clearly articulating in a reasonably specific manner a legitimate non-discriminatory reason" for the adverse action. Once the employer satisfies this burden of production, the plaintiff then has the burden of persuading the court that the proffered reason is a pretext for the true discriminatory reason.[50]

In this case, the Board articulated a legitimate, non-discriminatory reason for Coutu's termination: due to County budgetary constraints, the Board decided to merge three County positions, thus eliminating Coutu's position, to produce a yearly savings of $56,000.00. The Board also articulated a legitimate, non-discriminatory reason for the Board's failure to hire Coutu for the Executive Assistant position: Leahy was qualified for the position and had seniority over Coutu, and Coutu's poor working relationship with Oldland rendered her qualification for the position questionable. Coutu failed to produce *any* evidence that indicated that these reasons were pretextual. " '[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext of intentional discrimination where [an employer] has offered ... extensive evidence of

---

46. R7–509–10.

47. *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1498 and n. 3 (11th Cir.1985).

48. *Wilson v. AAA Plumbing Pottery Corp.*, 34 F.3d 1024, 1028 (11th Cir.1994).

49. *Welborn v. Reynolds Metals Co.*, 810 F.2d 1026, 1028 (11th Cir.1987).

50. *Conner*, 761 F.2d at 1499.

legitimate, non-discriminatory reasons for its actions.'"[51] Coutu's case against the Board consisted of repeated but unsubstantiated allegations of discrimination. Indeed, Coutu's testimony indicated that employees outside the protected class, such as Whittle, had problems with Oldland's "mood swings;" this testimony undermines Coutu's allegation that Oldland discriminated against her because she is Mexican–American. The district court did not err in granting a directed verdict on Coutu's claim of national origin discrimination.

### Retaliation

■ Coutu contends that the Board retaliated against her because she filed a grievance against Oldland, and because she protested allegedly unlawful discriminatory practices in carrying out her responsibilities as Personnel Assistant. Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[52] As with a discriminatory treatment claim, a plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case; the plaintiff must show (1) that she engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to the plaintiff's protected activities. This circuit has interpreted the causal link requirement broadly; "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."[53]

■ Having carefully reviewed the record in this case, we conclude that Coutu failed to establish a prima facie case of retaliation. As to her claim regarding the filing of the grievance, we find that Coutu failed to prove the first element of the prima facie case; that is, she failed to prove that the grievance constituted statutorily protected activity. Although Coutu's written grievance contained a conclusory allegation of racial discrimination, her attorney specifically waived this allegation at the grievance hearing. During the hearing, Coutu made no allegation and offered no proof of race or national origin discrimination; she contended only that she worked hard and deserved a better rating than Oldland had given her. Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII. Accordingly, Coutu's grievance against Oldland did not constitute statutorily protected activity.

■ As to Coutu's claim regarding her alleged protestations against unlawful discriminatory practices, we will assume, without deciding, that Coutu engaged in statutorily protected activities in carrying out her duties as Personnel Assistant to the County Administrator; thus, we will assume that she satisfied the first element of the prima facie case. She failed, however, to establish the third element; that is, she failed to establish that these activities were in any way related either to her termination or to the Board's decision not to hire her for the Executive Assistant position. While Oldland felt that Coutu was too aggressive in her role as an employee advocate, he criticized her in this regard *not* because she was attempting to "stop discrimination," but because she failed to complete necessary management tasks, such as the revision of the personnel manual. Notwithstanding a poor working relationship and Coutu's adamant refusal to accept constructive criticism, Coutu worked for Oldland for nearly three years. Had Oldland or the Board wished to terminate Coutu because of her efforts to "stop discrimination," they had ample opportunity and reason to do so long before the summer of 1986. The record indi-

**51.** *Young v. General Food Corp.*, 840 F.2d 825, 830 (11th Cir.1988) (quoting *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir.1987)), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989).

**52.** 42 U.S.C. § 2000e–3(a).

**53.** *Equal Employment Opportunity Commission v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571–72 (11th Cir.1993).

cates that any statutorily protected activities in which Coutu did engage as Personnel Assistant were completely unrelated to the negative employment action taken against her.[54]

## CONCLUSION

During the trial of this case, Coutu made repeated allegations of unlawful discrimination, but she failed to substantiate these allegations. The crux of her case against the Board was that she was overworked and underappreciated and that her position should not have been eliminated; essentially, she contended that she was unfairly treated. Title VII is designed to protect employees against discrimination based on race, sex, or national origin; it is *not* designed to protect against any and all unfair treatment in the workplace. As Coutu failed to prove her claims of unlawful discrimination, the district court did not err in granting a directed verdict for the Board. Accordingly, the decision of the district court is AFFIRMED. Appellees' motion to strike documents included in Coutu's "Addendum of Relevant Information" that are not a part of the record on appeal is GRANTED.

**54.** Even if Coutu did establish a prima facie case of retaliation, the claim would fail for the same reason that her national origin discrimination claim fails. The Board articulated legitimate non-discriminatory reasons for Coutu's termination and for the Board's decision not to hire her as Executive Assistant, and Coutu failed to show that these reasons were pretextual.