**Shirley WALDEMAR, Plaintiff,**

v.

**AMERICAN CANCER SOCIETY, Defendant.**

**Civil Action No. 1:94–CV–3178–JOF.**

United States District Court, N.D. Georgia, Atlanta Division.

March 28, 1996.

Adam J. Conti, Wimberly & Lawson, Atlanta, GA, for Plaintiff.

Joseph Maisel Freeman, John Raymond Trapnell, Elarbee, Thompson & Trapnell, Atlanta, GA, for Defendant.

### ORDER

FORRESTER, District Judge.

This matter is before this court on the Report and Recommendation by Magistrate Judge Gerrilyn G. Brill which recommends that Defendant's motion for summary judgment be granted [21–1], and on Plaintiff's objections thereto [22–1]. Because Petitioner's objections are unavailing and the Report appears accurate both in fact and in law, those objections are overruled. The Report and Recommendation is hereby ADOPTED as the order of this court and Defendant's motion for summary judgment is GRANTED [10–1].

### REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BRILL, United States Magistrate Judge.

Plaintiff, Shirley Waldemar, filed this action on December 1, 1994. Plaintiff contends that defendant terminated her and did not select her for another position because of her race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981; because of her national origin and sex, in violation of Title VII; and because of her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* Plaintiff also alleges sex discrimination with respect to the terms and conditions of her employment, in violation of Title VII.

Defendant has moved for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure based upon the pleadings, statements of material fact, exhibits, and discovery materials submitted by the parties. For the reasons that follow, the court **RECOMMENDS** that defendant's Motion for Summary Judgment [Doc. 10] be **GRANTED.**

### BACKGROUND FACTS [1]

Plaintiff is a black female of Jamaican national origin, born on November 24, 1934. She was hired by Dr. John Laszlo, Senior Vice President of Research, on April 18, 1988 as the Executive Assistant in the Research Department of defendant American Cancer Society's headquarters. (Plaintiff Dep., pp. 12, 15, 16). Dr. Laszlo was plaintiff's immediate supervisor throughout her employment with defendant. (Plaintiff Dep., p. 14).

As Executive Assistant, plaintiff was initially responsible for the overall daily management of the Research Department. (Plaintiff Dep., p. 15). She planned all of the logistics of the department's meetings and was responsible for the research committee. (*Id.*). She acted as the "office manager" of the department. (Plaintiff Dep., p. 16). Plaintiff's title was eventually changed from Executive Assistant to Executive Administrator, but her job duties remained the same. (Plaintiff Dep., pp. 16–17). In her brief, plaintiff contends that this change was a promotion. (Plaintiff's Resp., p. 2). However, plaintiff testified that it was a change in title, rather than a promotion. (Plaintiff Dep., p. 16).

Because of complaints made about problems in the Research Department, in September 1992, Aurelia ("Ree") Stanley, defendant's Vice President of Human Resources, conducted an investigation. (Ex. 2 to Plaintiff Dep.). She spoke with 12 current and former members of the department, and her conclusions were based on consistent comments indicating pervasive feelings within the department. (*Id.*).[2]

Ms. Stanley found that morale in the department was low, and that plaintiff was perceived to be an ineffective office manager, as she was unable to get along with the majority of the staff in the department.

---

1. Unless otherwise indicated, this court draws the undisputed facts from the Defendant's "Statement of Undisputed Material Facts." This court must deem as admitted those facts in the defendant's statement which are uncontroverted by the plaintiff. L.R. 220–5(b)(2) (N.D.Ga.).

2. Ms. Stanley, and all but about one member of the support staff, are black, like plaintiff. (Laszlo Aff., ¶ 4; Plaintiff Dep., p. 35).

(*Id.*). As a result of this investigation, Dr. Laszlo relieved plaintiff of her responsibility for the department's support staff. (Laszlo Aff., ¶ 4; Plaintiff Dep., pp. 19, 23–24).

Dr. Laszlo gave plaintiff annual performance evaluations from 1990 through 1992. (Exs. 3, 4, 5 to Plaintiff Dep.). In October 1990, plaintiff's overall rating was a 4.5 out of 5 possible points. (Ex. 3 to Plaintiff Dep.). At the time, a 5 meant "consistently exceeds expectations," and a 4 meant "regularly exceeds expectations." (*Id.*). In October 1991, plaintiff's overall rating was a 4 + +, on the same scale. (Ex. 4 to Plaintiff Dep.).

In November 1992, plaintiff received a rating of 2, out of 5 possible points. (Ex. 5 to Plaintiff Dep.). The meaning of the ratings had changed—a 5 meant "stellar," while a 2 meant "adequate." (*Id.*). Dr. Laszlo found "serious problems in communications" and "[n]ot a good year re: staff leadership...." (*Id.*). The evaluation ended with the comments that plaintiff had "[m] any strengths but some major difficulties that caused us to counsel Ms. Waldemar and to re-shape her responsibilities. This is intended to capitalize on strengths & minimize weaknesses which became limiting." (*Id.*).

Plaintiff received annual raises in 1989–1992. She did not receive an annual raise in January 1993. (Plaintiff Dep., p. 55). Dr. Laszlo informed her that she did not get a raise due to her performance problems in 1992 and due to the removal of her responsibility over the support staff. (Plaintiff Dep., p. 55; Ex. 6 to Plaintiff Dep.).

Defendant began reorganizing its headquarters in 1993. As part of the reorganization, each department head was responsible for redesigning his or her department to better meet defendant's needs and to ensure that staff resources were redistributed efficiently. (Laszlo Aff., ¶ 5). Each department had a design team and was given a target number of positions with which to rebuild the department. (*Id.*). The design team for the research department met on several occasions to determine the department's new structure, taking into account the major functions, products, and services provided by the department. (*Id.*). The final plans for the reorganization of the research department were approved by an interdepartmental task force and then by the executive team. (*Id.*).

In the research department, the positions of Executive Administrator and Grants Administrator were eliminated through the reorganization plan. (Laszlo Aff., ¶ 6). The duties of these two positions were combined to form the new position of Business Manager. (Plaintiff Dep., p. 79; Stanley Aff., ¶ 6). Plaintiff had been the Executive Administrator, and Mary LeMahieu, a 54–year–old white woman, had been the Grants Administrator. (Stanley Aff., ¶ 6). Two support staff positions in the department were also eliminated. (Plaintiff Dep., pp. 82–83).

On or about April 29, 1994, both plaintiff and Ms. LeMahieu were advised that their positions were being eliminated. Plaintiff, Ms. LeMahieu, and employees in other departments whose positions were eliminated were treated by defendant as "unassigned" employees, and were eligible to apply for open positions. (Stanley Aff., ¶ 4).

Three persons applied for the Business Manager position—plaintiff, Ms. LeMahieu, and Kay Smith, a 42–year–old white female employee. Dr. Laszlo interviewed the three applicants and selected Ms. LeMahieu. (Laszlo Aff., ¶ 7). Dr. Laszlo did not know the ages of either plaintiff or Ms. LeMahieu when he made the selection, and he did not know that plaintiff was older than Ms. LeMahieu. (Laszlo Aff., ¶ 9).

The factors Dr. Laszlo considered in selecting the Business Manager were: work experience, including budgetary accounting and grant management; experience with the basic and clinical research procedures; supervisory skills; computer skills; interpersonal skills; oral and written communication skills; and the history of the candidates' job performance. (Laszlo Aff., ¶ 8). Dr. Laszlo states that the last factor was most important. (*Id.*). Applying these factors, he concluded that Ms. LeMahieu was the most qualified candidate. (*Id.*).

Both Ms. LeMahieu and plaintiff started working in the department in 1988. Dr. Laszlo directly supervised plaintiff and had first-hand knowledge of Ms. LeMahieu's performance. (Laszlo Aff., ¶¶ 3, 9; Plaintiff

Dep., p. 14). Ms. LeMahieu was rated higher than plaintiff in overall performance evaluations in 1990, 1991, and 1992. As stated above, plaintiff's overall evaluations for those years were 4.5, 4++, and 2, respectively. In 1990 and 1991, Ms. LeMahieu received the highest performance rating, a 5, which meant "consistently exceeds expectations." (Exs. 3, 4 to Stanley Aff.). Her supervisor called the quality of her work "Top notch. Hard to imagine a more meticulous individual." (Ex. 3 to Stanley Aff). On her dependability, he stated that she "[c]onsistently delivers virtual perfection." (*Id.*). He concluded the 1990 evaluation by stating that Ms. LeMahieu "[h]as set a new standard of excellence" for the office. (*Id.*). In 1992, her overall performance rating was a 4 out of 5, which meant "outstanding." (Ex. 5 to Stanley Aff.). Even when her evaluation went down from a perfect 5 to a 4, she was described as "[e]xtremely dedicated, hard-working, and reliable." (Ex. 5 to Stanley Aff.).

Plaintiff argues that when her position was combined with Ms. LeMahieu's position, plaintiff was performing 80% of the job responsibilities listed in the Business Manager's position description. (Plaintiff Dep., pp. 85–86). Furthermore, plaintiff points out that she had supervisory experience, while Ms. LeMahieu did not. (Exs. 3, 4, 5 to Stanley Aff.). On the other hand, plaintiff's supervisory responsibilities were taken away from her because of serious problems in communications and poor staff leadership. (Ex. 5 to Plaintiff Dep.).

Unassigned employees were offered a severance package, which entitled them to continuation of their salary and benefits for a certain time, provided that they resign and release defendant from any ADEA claims relating to their employment and termination. (Stanley Aff., ¶ 4; Plaintiff Dep., p. 93). Plaintiff did not accept the severance package.

Plaintiff applied for several other positions with defendant, but did not obtain another position; she was terminated on June 3, 1994. At the time of her termination, plaintiff was 59 years old; Ms. LeMahieu was 54. (Stanley Aff., ¶ 1).

The only employees in the Research Department whose positions were eliminated and who were not placed elsewhere were three black females—plaintiff, and two young black female clerical employees. (Plaintiff Dep., p. 82–83). The clerical workforce in the department was predominantly black. (Plaintiff Dep., p. 35). The jobs of the two black clerical employees were phased out in the reorganization, and there was no more work for them to do. (Plaintiff Dep., pp. 82–83).

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 24, 1994, and amended that charge on June 27, 1994.

## I. *Summary Judgment Standard*

The court should grant a motion for summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The movant carries its burden by showing the court that there is "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

II. *Plaintiff's claim of unfavorable treatment*

■ In her EEOC complaints, plaintiff did not raise any claims of discrimination relating to her experiences prior to her termination and non-selection. In paragraph 19 of her Complaint, plaintiff contends that Dr. Laszlo and others discriminated against her based on sex by according favorable treatment to some of plaintiff's co-workers, including Deborah Siebels. Defendant argues that any such claim brought here exceeds the scope of the EEOC complaint.

■ The scope of the judicial complaint is limited to the scope of the "EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970). Claims omitted from the EEOC charge may still be litigated when "reasonably related" to those claims brought in the EEOC charge. *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970). If not reasonably related, the court is precluded from considering claims not raised in the EEOC complaint. *See, e.g., Plaisance v. Travelers Ins. Co.,* 880 F.Supp. 798, 807 (N.D.Ga.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 338, 133 L.Ed.2d 236 (Oct. 16, 1995).

Plaintiff's claim for unfavorable treatment exceeds the scope of her EEOC complaint, as the EEOC investigation would not have reasonably expanded to include it. Accordingly, this claim should be dismissed on summary judgment.

■ Additionally, plaintiff's unfavorable treatment claim fails on the merits. She only puts forth one comparator, Deborah Siebels. A plaintiff cannot show sex discrimination when her only comparator is of her same sex. *See, e.g., Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 334 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Coutu v. Martin County Bd. of County Comm'rs,* 47 F.3d 1068, 1073 (11th Cir.1995).

Because plaintiff's only comparator for this sex discrimination claim is a woman, like herself, she has not established a *prima facie* case of sex discrimination. For the two stated reasons, the court **RECOMMENDS** that defendant's Motion for Summary Judgment [Doc. 10] be **GRANTED** as to plaintiff's sex discrimination claim based on unfavorable treatment that occurred prior to her not being selected for a new position and prior to her termination. This claim of discriminatory treatment will be considered in connection with plaintiff's other claims only to the extent it may provide evidence in support of those claims.

III. *Merits of Plaintiff's Discrimination Claims*

Plaintiff contends that defendant discharged her and failed to hire her as Business Manager because of her race, sex, national origin, and age. Because age discrimination claims under the ADEA and race discrimination claims under 42 U.S.C. § 1981 follow the same analysis as Title VII claims, the court treats all of these claims together. *See Crawford v. Western Elec. Co.,* 745 F.2d 1373, 1376 (11th Cir. 1984) (finding that § 1981 claims follow same analysis as Title VII claims); *Archambault v. United Computing Sys., Inc.,* 786 F.2d 1507, 1512 (11th Cir.1986). (finding same for ADEA claims).

■ For these individual disparate treatment claims, plaintiff may present a *prima facie* case in one of two ways: with direct evidence of discriminatory intent in the form of actions or remarks of the employer, *Hill v. Metro. Atlanta Rapid Transit Auth.,* 841 F.2d 1533, 1539 (11th Cir.1988), *modified,* 848 F.2d 1522 (11th Cir.1988); *Wall v. Trust Co. of Georgia,* 946 F.2d 805, 809–10 (11th Cir.1991); or through a variant of the four-part circumstantial evidence test established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

A. *Discriminatory Termination Claim*

■ Because plaintiff has not shown direct evidence to support any of her claims, she must rely upon the *McDonnell Douglas* analysis, which has been modified for reduction in force cases, as follows: Plaintiff must show that she is (1) a member of a protected

group; (2) qualified to perform in another available position with her employer at the time of her discharge; and (3) evidence by which a fact finder might "reasonably conclude" that discriminatory motives played a role in the decision. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1082–83 (11th Cir.1990).

Plaintiff is a black female of Jamaican national origin, and was 59 years of age at the time of her termination. As such, she is a member of a protected class for her race, sex, national origin, and age claims. She shows that she was at least minimally qualified for her position as Executive Administrator, as she performed the job for several years.

To satisfy the third element of a *prima facie* case, plaintiff must show evidence from which a factfinder could reasonably conclude that unlawful discrimination played a role in her termination. Plaintiff makes two arguments from which she contends that unlawful discrimination may be inferred.

■ First, plaintiff argues that defendant made her position vulnerable during the reorganization by systematically taking away her duties and giving them to a younger white female, Debbie Siebels. Taking away an employee's duties in this circumstance is similar to replacing her with someone outside of her protected class, and such a showing is arguably sufficient to satisfy the final element of a *prima facie* case. *Coutu,* 47 F.3d at 1073. Therefore, the court will assume that plaintiff has made a *prima facie* case of discrimination based on age, race, and national origin. However, since both plaintiff and Ms. Siebels are female, this evidence does not support a *prima facie* case of discrimination based on sex.

■ Second, plaintiff argues that age discrimination may also be inferred from defendant's offering her a severance package, which included a waiver and release of any claim under the ADEA. She contends that defendant presented the waiver without complying with the statutory requirements, such that it was not a "knowing and voluntary" waiver. Plaintiff relies on *Griffin v. Kraft General Foods,* 62 F.3d 368 (11th Cir.1995)

for the proposition that not complying with the statutory requirements makes the severance pay offer inherently coercive, which in turn gives rise to an inference of discrimination.

In *Griffin,* terminated employees who signed a waiver of potential ADEA claims as a condition of receiving severance benefits sought to invalidate the releases, arguing that they did not comply with the requirements of the Older Workers' Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626(f). *Griffin,* 62 F.3d at 368. *Griffin* does not support plaintiff's argument; it said nothing about whether the failure to satisfy requirements of the OWBPA when conditioning severance benefits on a waiver of ADEA claims would give rise to an inference of discrimination based on age. Plaintiff has cited no other authority for this proposition.

Even if such an inference were appropriate, plaintiff does not specify which provisions of the act the agreement allegedly violates, or why it does so. After reviewing the proposed severance agreement, the court is unable to find any violation of the OWBPA. Therefore, the severance pay offer is not evidence from which a factfinder could reasonably infer that defendant terminated plaintiff because of her age. However, as stated above, the court will assume plaintiff has already made a *prima facie* showing of age discrimination for her discharge claim.

In sum, plaintiff has satisfied a *prima facie* case for her discriminatory discharge claim based on age, race, and national origin; she has not done so for her claim based on sex.

1. *Defendant's Rebuttal of the Prima Facie Case*

■ To defeat the presumption of discriminatory intent, defendant must simply articulate a legitimate, non-discriminatory reason for the allegedly discriminatory action. This Circuit has described defendant's burden as "exceedingly light." *Perryman v. Johnson Prods. Co.,* 698 F.2d 1138, 1142 (11th Cir.1983). Defendant's burden is merely one of production, not proof. *Id.* "The defendant need not persuade the court that it was actually motivated by the proffered reasons, but it is sufficient if the defen-

dant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 248, 101 S.Ct. 1089, 1091, 67 L.Ed.2d 207; *Jones v. Gerwens,* 874 F.2d 1534, 1538 (11th Cir.1989).

 Here, defendant has articulated a legitimate, non-discriminatory reason for plaintiff's termination: Her position was eliminated as part of a reorganization of the American Cancer Society. Therefore, the presumption of discriminatory intent disappears.

### 2. *Plaintiff's Burden to Prove Pretext*

 Because defendant has successfully rebutted plaintiff's *prima facie* case, plaintiff must introduce evidence from which a jury could find by a preponderance of the evidence that defendant's proffered reasons are pretextual. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 921 (11th Cir. 1993). When defendant moves for summary judgment, the only issue for the trial court is "whether the plaintiff's evidence has placed material facts at issue." *Id.* The plaintiff can prove pretext in either of two ways, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

 In order to ultimately prevail, plaintiff must prove by a preponderance of the evidence that his national origin actually motivated defendant's employment decision. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 523–24, 113 S.Ct. 2742, 2756, 125 L.Ed.2d 407, 427 (1993) (stating, "[t]hat the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of race is correct"). However, in the Eleventh Circuit, the standards for pretext at trial and at the summary judgment stage are different. To avoid summary judgment, plaintiff need only show that defendant's proffered

reasons are pretextual, not that they are a pretext for discrimination. "Under *St. Mary's,* a plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. B.P. Oil Co.,* 32 F.3d 520, 526 (11th Cir.1994). And, to show pretext, plaintiff is not required to introduce additional evidence beyond that required to establish his *prima facie* case. "[T]he plaintiff's initial evidence, combined with effective cross-examination of the defendant," may suffice to prove pretext. *Hairston,* 9 F.3d at 921.

 Plaintiff argues that defendant's proffered reason is a pretext for race discrimination because the only employees in the Research Department whose jobs were eliminated in the reorganization, and were not placed into other positions, were plaintiff and two other black females.[3] However, when viewed in context, plaintiff's evidence would not support a finding that defendant's reason is pretextual. The other two black employees who lost their jobs in the reorganization and were not placed into other positions were support staff. Plaintiff admits that the work of two support staff members was eliminated in the reorganization (Plaintiff Dep., pp. 82–83), and that the support staff was predominantly black. (Plaintiff Dep., p. 35). As defendant points out, plaintiff has presented no evidence that either of these employees applied for or were qualified for another position. Furthermore, the fact that these employees were young (Plaintiff Dep., p. 83) merely reinforces defendant's contention that age was not a consideration. For all of these reasons, a factfinder could not reasonably infer, from plaintiff's evidence that two black support personnel lost their jobs in the reorganization, that defendant's proffered reason is pretextual.

On the other hand, plaintiff's own testimony reinforces defendant's position that plaintiff was not terminated for unlawful reasons. In her deposition, plaintiff was asked, "Why did you think [some of your duties were

---

**3.** Because plaintiff has not shown a *prima facie* case of sex discrimination, the sex of these other employees is not relevant.

taken away] based on race, age, sex, or national origin?" (Plaintiff Dep., p. 125). She responded, "Well, for one thing, I did not—I did not entertain people at my home. I was a private person. I didn't bring—you know, and the perception that people in the department had of me because I am a private person." (*Id.*). She was then asked, "What significance did entertaining people in your home have?" (*Id.*). She responded, "Because everybody else did it and I didn't do it, so I was different." (*Id.*).

Thus, plaintiff states that one factor that made her different and ultimately caused her to be vulnerable to the reorganization was her private nature and her failure to entertain people in her home—not her race, sex, national origin, or age. Plaintiff does not allege or show evidence that her private nature was in any way related to her race, sex, national origin, or age. Therefore, terminating an employee for those reasons would not be prohibited by Title VII, § 1981 or the ADEA. Plaintiff's own testimony supports a conclusion that defendant took action against her for reasons other than those prohibited by the employment discrimination statutes.

▆▆Furthermore, the undisputed evidence is that Dr. Laszlo took away some of plaintiff's duties because of performance problems. Ree Stanley, the Vice President for Human Resources Administration, and a black woman, interviewed staff in the research department regarding declining morale directly related to plaintiff. (Ex. 2 to Plaintiff Dep.). Her conclusions were based on consistent comments indicating pervasive feelings within the department. (*Id.*). Ms. Stanley found that plaintiff was unable to get along with a majority of the staff members in the department. (*Id.*).

One specific complaint of the staff was that plaintiff made rules that she would then violate. (*Id.*). Plaintiff's own testimony corroborates this complaint. Plaintiff states that, on occasion, the Research Department had meetings with volunteers, and lunch was provided. (Plaintiff Dep., p. 36). After lunch, there were often leftovers. (*Id.*). Plaintiff states that she sent memoranda to the secre-

taries, telling them not to invite people outside of the department to eat the leftovers. (Plaintiff Dep., p. 37). However, plaintiff admits to violating this rule on one or two occasions causing discontent among some of the secretaries. (Plaintiff Dep., pp. 36–37). Similarly, plaintiff admonished secretaries for making personal long-distance calls from work, while she made many such calls.[4] (Ex. 15 to Plaintiff Dep.).

As a result of these problems, plaintiff's supervisory duties over the support staff were taken away from her. (Laszlo Aff., ¶ 4; Plaintiff Dep., p. 19). Plaintiff's responsibility over the agenda books for the Research and Clinical Investigation Committee was removed because numerous serious errors were found in the books. (Ex. 17 to Plaintiff's Dep.). Because some of plaintiff's duties were eliminated, her responsibilities to the department became unclear. (Ex. 2 to Plaintiff's Dep.). Her overall evaluation for 1992 dropped to a 2 out of a possible 5 points, a marked drop from her past two annual evaluations. (Ex. 5 to Plaintiff's Dep.). It is in this context that plaintiff's position was vulnerable during the company-wide reorganization and was eventually eliminated.

▆▆ Finally, two facts relating to Dr. Laszlo, the decision-maker, add to the court's conclusion that a jury could not find that Dr. Laszlo's actions were motivated by unlawful discrimination. First, Dr. Laszlo, a man in his sixties, was older than plaintiff. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir.1991) (finding that plaintiff "faces a difficult burden" when the decision-maker is well over age forty because such a person is more likely to be the victim of age discrimination than its perpetrator).

▆▆ Secondly, Dr. Laszlo is the person who initially hired plaintiff. The court in *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) recognized that "[i]t hardly makes sense to hire workers from a group one dislikes ... only to fire them once they are on the job." The Proud court held that "in cases where the hirer and the firer are the

---

4. Plaintiff admitted making such calls, but offered to reimburse defendant for the cost of any

such calls if defendant researched the matter. (Ex. 16 to Plaintiff Dep.).

same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Id.; see also, Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 175 (8th Cir.1992) (finding that it would be "simply incredible" that a company that hired plaintiff at age 51 had "suddenly developed an aversion to older people" and fired him two years later because of his age).

Finally, this is not a case in which plaintiff was simply terminated. Her position, along with others', was eliminated on the recommendation of the department's design team, which was then approved by an interdepartmental task force, and by the executive team. (Laszlo Aff., ¶ 5). There is no evidence that the individuals who made the decision to eliminate plaintiff's position had discriminatory motivation. After her position was eliminated, she was permitted to apply for other positions with defendant, and she did so. When she was unable to find another position, defendant offered her a severance package.

In sum, plaintiff has failed to establish a *prima facie* case of sex discrimination relating to her termination claim. And, she has not presented evidence from which a factfinder could conclude that defendant's proffered reason for terminating her was pretextual. Accordingly, the court **RECOMMENDS** that defendant's Motion for Summary Judgment [Doc. 10] be **GRANTED** for plaintiff's termination claim.

### B. *Failure to Hire Claim*

#### 1. *Prima Facie Case*

To present a *prima facie* case of discriminatory failure to hire, plaintiff must show: (1) that she is a member of a protected class; (2) that she applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite her qualifications, she was rejected; and (4) that, after her rejection, the employer hired someone outside of plaintiff's protected class, or the position remained open and the employer continued to seek applicants from persons with plaintiff's qualifications. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Coutu,* 47 F.3d at 1073.

As stated above, plaintiff is a member of a protected class for her race, sex, national origin, and age discrimination claims. She applied for, and was at least minimally qualified for, the Business Manager position. She was interviewed and rejected. Therefore, plaintiff meets the first three elements of a *prima facie* case.

The court notes that in addition to applying for Business Manager, plaintiff applied for several positions and was rejected from them all without interviews.. However, she does not show that she was qualified for most of the positions. And, because plaintiff does not know who was actually hired for most of the positions, she had not shown that she was rejected, while a person outside of her protected class has hired. (Plaintiff's Dep., pp. 62–65).

The court resolves plaintiff's argument regarding her rejection for the position of Legislative Assistant in defendant's Washington, D.C. office as follows: To support this claim, plaintiff states that Executive Assistant Jane Hanahan told her that Cary Wilson, the Vice President of Governmental Affairs, had said that plaintiff was not selected for the position of Legislative Assistant because Ms. Wilson could not "touch" plaintiff. (Plaintiff Dep., pp. 59–60). This evidence is inadmissible hearsay, which the court may not consider in evaluating defendant's motion for summary judgment. Fed.R.Evid. 801(c), 802. Furthermore, even if the evidence was admissible, the meaning of the statement is so vague that no inference of discrimination could be reasonably drawn from it. Accordingly, the court considers plaintiff's failure to hire claim only as it relates to the Business Manager position.

For the fourth element of a *prima facie* case, plaintiff shows that Ms. LeMahieu was selected as Business Manager. Like plaintiff, Ms. LeMahieu is female; therefore, this evidence does not support a *prima facie* case of sex discrimination.

For a *prima facie* case of age discrimination, plaintiff must point to a sufficient age difference between herself and the person selected such that a factfinder could reasonably conclude that the selection was based on age. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir.1995), *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995). At the time of the selection, plaintiff was 59, Ms. LeMahieu was 54, and Ms. Smith, the third candidate, was 42. All three women were protected by the ADEA. Dr. Laszlo did not choose the youngest candidate; he chose Ms. LeMahieu, who is only five years younger than plaintiff, but twelve years older than Ms. Smith. Because there was only a five-year age difference between plaintiff and Ms. LeMahieu, a factfinder could not reasonably conclude that Dr. Laszlo's decision was based on age. Accordingly, plaintiff has not shown a *prima facie* case of age discrimination.[5]

Because Ms. LeMahieu is neither of Jamaican origin nor black, plaintiff has shown only that a person of a different national origin and race got the job. Therefore, she has established a *prima facie* case of race and national origin discrimination relating to her non-selection as Business Manager.

### 2. *Defendant's Rebuttal of the Prima Facie Case*

As stated above, to defeat the presumption of discriminatory intent, defendant must simply articulate a legitimate, non-discriminatory reason for the allegedly discriminatory action.

Defendant articulates a legitimate, non-discriminatory reason for not selecting plaintiff as Business Manager: Dr. Laszlo reasonably believed that Ms. LeMahieu's performance and abilities exceeded those of plaintiff. Therefore, the presumption of discriminatory intent disappears.

### 3. *Plaintiff's Burden to Prove Pretext*

As discussed above, because defendant has successfully rebutted plaintiff's *prima facie* case, plaintiff must introduce evidence from which a jury could find by a preponderance of the evidence that defendant's proffered reasons are pretextual.

Plaintiff first argues that she was more qualified than Ms. LeMahieu. She states that, in her opinion, when their two jobs were combined into the Business Manager position, plaintiff's duties made up 80% of the job's responsibilities. (Plaintiff Dep., pp. 85–86). She bases that opinion on the list of duties in the position's job description. (Plaintiff Dep., p. 85–86; Ex. 11 to Plaintiff Dep.). Plaintiff states that she was not performing the scientific duties of the job, for which she was not trained. (Plaintiff Dep., p. 88). These duties included processing, approving, and revising research grant application budgets, and ensuring that budget requests adhere to defendant's guidelines and policies. (Plaintiff Dep., p. 87). While plaintiff may have been performing a majority of the listed duties, she has not shown which duties were considered more important. Furthermore, according to her most recent evaluation, she was not performing many of her duties well.

Plaintiff also argues that while she had supervisory experience, Ms. LeMahieu did not. Of course, since plaintiff's supervisory duties were taken away because of her inability to get along with her subordinates, plaintiff's supervisory problems arguably made her less desirable a supervisor than the inexperienced but well-rated Ms. LeMahieu.

In any event, whether plaintiff was in fact more qualified is not material. The issue is whether Dr. Laszlo reasonably believed that Ms. LeMahieu's performance and abilities

---

**5.** The court notes that even if plaintiff had shown a *prima facie* case of age discrimination, she has not shown that defendant's reason is pretextual. Dr. Laszlo was 63 years old when he selected Ms. LeMahieu over plaintiff; he was several years older than plaintiff, and was himself protected by the ADEA. As defendant points out, the fact that Dr. Laszlo, the decision-maker, was older than plaintiff makes it less likely that he discriminated against her based on her age. *See Elrod*, 939 F.2d at 1471. Furthermore, there is no evidence that Dr. Laszlo knew plaintiff's age when he selected the Business Manager (Plaintiff Dep., p. 50), and he did not know that plaintiff was younger than Ms. LeMahieu. Finally, in addition to rejecting plaintiff, he rejected the youngest applicant.

exceeded those of plaintiff. "[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory.... " *Moore v. Sears, Roebuck & Co.,* 683 F.2d 1321, 1323 n. 4 (11th Cir.1982).

Dr. Laszlo directly supervised plaintiff, and he had first-hand knowledge of Ms. LeMahieu's performance in the department. Dr. Laszlo wrote plaintiff's performance evaluations in 1990, 1991, and 1992 (Exs. 3, 4, 5 to Plaintiff Dep.), and he reviewed and signed Ms. LeMahieu's performance evaluations for the same years. (Exs. 3, 4, 5 to Stanley Aff.). Both women began working in the department in 1988.

The evidence shows that plaintiff had performance problems resulting in low morale of her subordinates. As a result, her supervisory duties were taken away from her. She had more problems, and further duties were taken from her. On the other hand, there is no evidence that Ms. LeMahieu had performance problems. Plaintiff states that she does not know whether Ms. LeMahieu was competent for the Business Manager position. (Plaintiff Dep., p. 72).

In evidence are performance evaluations of plaintiff and Ms. LeMahieu for 1990, 1991, and 1992. Ms. LeMahieu received higher overall ratings than plaintiff in all three years, including two perfect 5 ratings. While plaintiff's ratings were only slightly below Ms. LeMahieu's ratings in 1990 and 1991, her 1992 rating, the most recent rating before the Business Manager position was filled, was significantly lower than Ms. LeMahieu's rating for that year.

Therefore, plaintiff has not shown evidence from which a factfinder could conclude that it was unreasonable for Dr. Laszlo to believe that plaintiff's performance was less satisfactory than Ms. LeMahieu's.

■ Next, plaintiff argues that because Dr. Laszlo interviewed Ms. LeMahieu for a longer period of time than he interviewed her, an inference of discrimination may be raised. The court disagrees. Many reasons may have accounted for the different lengths of the interviews. For example, Dr. Laszlo may have interviewed plaintiff for a shorter period of time because, as her direct supervisor, he knew her well, while he did not have as much direct contact with Ms. LeMahieu. A factfinder could not reasonably infer discrimination from the length of time of the interviews.

Plaintiff argues that Ms. LeMahieu was chosen because of her race "[b]ecause traditionally when it comes down to a black and a white issue, whites always win." (Plaintiff Dep., p. 76). She argues that this is how things are "anywhere ... in this day and age." (*Id.*). Plaintiff jumps from these general statements regarding racism anywhere, to the contention that defendant must have failed to select her as Business Manager because of her race. Plaintiff has presented no evidence to support this contention. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered ... extensive evidence of legitimate, non-discriminatory reasons for its actions." *Carter v. Miami,* 870 F.2d 578, 585 (11th Cir.1989) (quoting *Young v. General Foods Corp.,* 840 F.2d 825, 830 (11th Cir.1988)).

Again, as discussed above, because Dr. Laszlo is older than plaintiff and protected by the ADEA, and because he initially hired her, it is less likely that he discriminated against her.

In sum, a jury could not reasonably find defendant's proffered reason to be pretextual. Accordingly, the court **RECOMMENDS** that defendant's Motion for Summary Judgment [Doc. 10] be **GRANTED** as to plaintiff's claim for non-selection based on race, sex, national origin, and age.

## IV. *Fees and Costs*

Defendant has requested that the court award defendant its costs, including reasonable attorney's fees.

■ As plaintiff points out, prevailing defendants are awarded fees and costs only if the action was frivolous and unreasonable, or if plaintiff continued to litigate after her

claims were clearly shown to be frivolous or unreasonable. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 416–18, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978); *Hughes v. Rowe,* 449 U.S. 5, 14–15, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980).

Although the court believes plaintiff's lawsuit is without merit, it does not rise to the level of frivolousness that would justify the imposition of fees and costs against plaintiff. Accordingly, the court denies defendant's request for costs, including reasonable attorney's fees.

### V. *Conclusion*

The court **RECOMMENDS** that defendant's Motion for Summary Judgment [Doc. 10] be **GRANTED.**

Nov. 30, 1995.