James C. SPENCE, Plaintiff,

v.

PANASONIC COPIER COMPANY, a Division of Matsushita Electric Corporation of America, and Stacy Turner, Defendants.

No. Civ.A.1:97CV1817–GGB.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 9, 1999.

Tammi M. Berden, Atlanta, GA, for plaintiff.

David Richard Kresser, Fisher & Phillips, Atlanta, GA, for defendants.

## ORDER

BRILL, United States Magistrate Judge.

Plaintiff James C. Spence ("Spence") filed this action on June 24, 1997. He alleges that defendant, through its employee, Stacy Turner, harassed and discriminated against him, and terminated his employment because of his sex (male) and in

retaliation for complaining about harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* In addition, plaintiff pursues a state law claim of intentional infliction of emotional distress.

The parties have consented to jurisdiction by a United States Magistrate Judge. This action is presently before the court on defendant's Motion For Summary Judgment [Doc. 28]. For reasons discussed below, defendant's Motion for Summary Judgment is **GRANTED.**

I. *Background Facts*[1]

Defendant Panasonic Copier Company ("PACC") is a nationwide company engaged in the business of selling copy machines. In January of 1995, PACC opened its Atlanta, Georgia sales office. During the relevant time period, Michael Cobb was branch manager and Rodd Denzer was sales manager. Denzer reported to Cobb. Together, they hired a staff of sales representatives to sell PACC products.

Ms. Stacy Turner was hired as a sales representative and began work at the PACC Atlanta office in February 1995. As the level of sales grew, the Atlanta office hired additional sales representatives. Denzer and Cobb hired plaintiff on July 24, 1995 as a sales representative. From July 1995 until April 1996, Turner, Spence and all other sales representatives reported to sales manager Denzer.

Effective the beginning of the fiscal year on April 1, 1996, sales manager Denzer was promoted and transferred. Manager Cobb divided the sales force into two teams and promoted two senior sales representatives to sales manager positions to replace Denzer. Turner was one of the employees promoted to sales manager effective April 1, 1996, and plaintiff was assigned to her team. Effective at the beginning of the new fiscal year, April 1, 1996, PACC's management established sales quotas for the sales representatives.

After Ms. Turner became sales manager in April 1996, she hired five sales representatives, all of whom were men. The only two female employees supervised by Ms. Turner, Anna Villafara and Susan Boyer, were hired by PACC before Ms. Turner became a sales manager. Ms. Turner documented Ms. Villafara's excessive absenteeism (Ex. 4 to Cobb Aff.) and Ms. Villafara resigned the company by mutual agreement the month that Ms. Turner began supervising her. (Turner Dep. p. 71). During the period of time that plaintiff and Ms. Boyer were supervised by Ms. Turner, Ms. Boyer had a significantly better sales record than plaintiff. (Ex. 1 to Cobb Aff).

Plaintiff had a revenue sales quota for each of the months that he was employed by PACC.[2] (Pl.Dep. p. 99). Beginning April 1, 1996, plaintiff's monthly sales quota was set at $24,000 based on a formula applicable to all sales representatives. (Cobb Dep. pp. 46–47; Cobb Aff. ¶ 2, Ex. 1; Pl.Dep. p. 101). Plaintiff failed to meet this quota in April, May, June, July, August, September and October of 1996. (Pl. Ex. 12 (Sales Quota Sheets); Cobb Aff.Ex.

---

1. Unless otherwise indicated, this court draws the facts from the uncontested portions of defendants' "Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried." (*See* Doc. 20, Attachment and Doc. 28). This court must accept as admitted those facts in the defendants' statement that plaintiff has not "specifically controverted" with citation to relevant portions of the record. Local Rule 56.1B(2), (3), N.D.Ga.

2. Plaintiff contends in some places in the record that he could achieve his quota by either producing revenue or by "unit placement." (See Pl.Resp. to Def.St. of Undisputed Facts

¶ 11; Pl.Aff. ¶ 16). Plaintiff does not explain what he means by "unit placement" or how "unit placement" differs from revenue production. Assuming "unit placement" means selling a copy machine to a customer, the court assumes that "unit placement" results in revenue for the company unless the customer fails to pay for the machine. In any event, plaintiff admitted in his deposition that he had a "revenue quota." (Pl.Dep. p. 99). Therefore, the court will disregard any subsequent statements regarding "unit placement" as immaterial.

1; Pl. Dep. pp. 99–101). Plaintiff made no sales at all in his last month of employment, October 1996.

Plaintiff's personnel file contains warning letters addressed to plaintiff dated October 3, 1995, January 2, 1996 and March 11, 1996 from Michael Cobb for plaintiff's failure to achieve his sales quota in September 1995, December 1995 and February 1996. (Spence Dep., Ex. 5, 7, & 9). Each of these documents purports to be signed and acknowledged by plaintiff. Plaintiff acknowledges that he received and signed the October 3, 1995 warning letter. (Def.Ex. 5 to Pl.Dep.; Pl.Dep. p. 109). Plaintiff denies that he received the January 2, 1996 or March 11, 1996 warning letters. He contends that his signatures on those documents are forgeries. (Pl. Dep. pp. 115–117, 119–121). Nevertheless, plaintiff does not deny defendant's contention that he failed to meet his quota for December 1995 or February 1996. (Pl. Dep. pp. 117, 120). Turner was not plaintiff's supervisor at the time these pre-April 1996 letters were issued.

Plaintiff's personnel file contains warning letters from Ms. Turner dated September 3, 1996 and October 1, 1996 for plaintiff's failure to achieve sales quota in August 1996 and September 1996. (Pl. Dep.Exs.14, 17). These two documents purport to have plaintiff's signature. In his deposition, plaintiff denied ever receiving these documents and contended that his signatures are forgeries. (Pl.Dep. pp. 155–156, 172). Nevertheless, plaintiff does not deny that he failed to meet his sales quota for August and September of 1996.[3] (Pl.Dep. pp. 157, 172). The October 1, 1996 warning letter states in part:

> As you are no doubt aware, during the month of September 1996 you have once again failed to meet your assigned sales quota. Consistent with the written documentation previously provided to you, PACC Management now deems it necessary to more formally address your cur-

rent level of work related performance ... [Y]our repeated inability to achieve your assigned quota is unacceptable and leaves us no choice but to place you on probation. Please understand that this means that failure to show immediate and sustained improvement will result in further disciplinary action up to and including your termination.

Plaintiff made no sales the following month, October 1996.

Plaintiff's personnel file also contains warning letters regarding matters other than sales. His file contains a memorandum dated January 15, 1996 from then-administrative manager Bob Poston regarding plaintiff's driving recklessly in the parking lot. (Ex. 8 to Pl.Dep.). Plaintiff admits that Denzer discussed this memo with him but denies that he drove recklessly in the PACC parking lot. (Pl. Dep. pp. 118–119).

Plaintiff's personnel file contains another warning letter for reckless driving from Poston to plaintiff dated June 3, 1996. (Ex. 12 to Pl.Dep.). The memorandum purports to have plaintiff's signature, but plaintiff contends that he never saw this document and that his signature is forged. (Pl.Dep. p. 129). Plaintiff denies that he was driving recklessly in the parking lot on this occasion. (Pl.Dep. pp. 129–130).

Plaintiff's personnel file also contains a warning letter from Denzer concerning absenteeism and lack of "demo activity" dated November 9, 1995 (Spence Dep.Ex. 6); a warning letter for absenteeism dated April 24, 1996 (Spence Dep.Ex. 10); a warning letter for absenteeism and lack of "demo activity" dated May 22, 1996, and a warning letter for absenteeism and lack of "demo activity" dated September 4, 1996. (Spence Dep.Ex. 15). The May 22, 1996 and September 4, 1996 letters purport to have Spence's signature acknowledging that he received them.

---

**3.** Plaintiff admits in his affidavit that Turner sent him letters reprimanding him for failing to meet August through October 1996 sales quotas. (Pl.Aff ¶ 24).

Spence denies that he received the November 9, 1995 warning letter but admits that he and Denzer discussed concerns regarding his "lack of demo activity". (Pl. Dep. p. 111–12). He admits that he received the April 24, 1996 letter but denies its allegations. (Pl.Dep. p. 122). Plaintiff admits that he received the May 22, 1996 letter but contends that he refused to sign and acknowledge it because he disagreed with it. (Pl.Dep. p. 127). He contends his purported signature on the document is a forgery.

Plaintiff admits that he received the September 4, 1996 warning letter from Ms. Turner and that he signed it.[4] (Pl.Dep. p. 157). He stated that upon receiving the letter, he told Ms. Turner, in the presence of other employees, that he did not agree with it. He then "wadded it up," "threw it in the garbage," and told Ms. Turner, "This is what I think of your letter." (Pl. Dep. p. 161; Turner Dep. pp. 91–92). On September 6, 1996, Ms. Turner wrote a memorandum to plaintiff advising him that his conduct upon receiving the September 4, 1996 letter was inappropriate and insubordinate. (Ex. 16 to Pl.Dep; Pl.Dep. p. 168). In addition to the September 6 memorandum from Ms. Turner, Jim Price with Human Resources told plaintiff that further similar behavior could result in his termination. (Pl.Dep. p. 171).

On October 30, 1996, in a memo to Jim Price of Human Resources, Ms. Turner requested that plaintiff's employment be terminated. She wrote:

Unfortunately, I must submit a request for release of Chriss Spence. As you are aware, we have attempted to help improve the performance of this employee a number of times through meetings with yourself as well as with the General Manager, Mike Cobb and myself.

Enclosed are the documents outlining problems we have addressed with

Chriss. Just this month, (to add to my concern) Chriss has been absent two days. One occurring on October 1st, to be in court; and one sick day occurring on October 10th. Chriss has also been late an additional eight days in October—occurring on 10/2, 10/3, 10/4, 10/7, 10/23, 10/18, 10/29 and 10/30. He has been anywhere from 20 minutes up to 1 hour late. This all occurred when he is aware that he is on probation. I have also included a year-to-date print out of all our sales force. Clearly he is producing less than acceptable numbers compared to his $24,000 a month quota as well as compared to *every* sales person in the office. I have highlighted the employees who have been selling April 96 – September 96, so you can see true year-to-date sales numbers instead of employees who have started in June, July 96 etc. or employees who have left the branch.

Please accept my request for release of Chriss Spence due to his lack of performance in sales numbers, countless instances of insubordination and reluctance to follow simple policies set forth by management (i.e. attendance and tardiness).

On October 31, 1996, branch manager Cobb gave plaintiff the option of either being discharged or resigning. (Pl.Dep. pp. 189–196). Plaintiff was escorted off the business premises on October 31, 1996 by management. Although plaintiff disputes defendant's contention that he resigned, it is undisputed that plaintiff's employment with defendant was terminated involuntarily on or after October 31, 1996. For purposes of this decision, the precise date of the termination is not material. L. Vincent Shinholster, a male, was hired to replace plaintiff.

Ms. Turner, at various times, stated that women are better than men at selling copiers. (Pl.Dep. p. 246[5]). She also cursed

---

4. Ms. Turner was on maternity leave from approximately mid-July through mid-August, 1996.

5. Plaintiff added in his affidavit that Ms. Turner said that "men were inferior to women". (Pl.Aff ¶ 14). Co-workers Danley and Hagaman, who also heard Ms. Turner's comments,

loudly at plaintiff and other men and publicly berated plaintiff's performance, behavior that plaintiff felt was outrageous, "especially coming out of a young lady." (Pl.Dep. p. 253, Pl.Aff ¶ 32).

Other facts are set forth in the discussion section below.

## II. *Summary Judgment Standard*

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The movant carries the initial burden and must show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

"In an employment discrimination case, the plaintiff must produce sufficient evidence to support an inference that the defendant-employer based its employment decision on an illegal criterion." *Benson v.* *Tocco, Inc.,* 113 F.3d 1203 (11th Cir.1997). Summary judgment in favor of the defendant-employer is proper unless the plaintiff puts forth sufficient evidence to allow a fact finder to disbelieve each of the employer's proffered explanations for its actions. *Benson,* 113 F.3d at 1207 (citing *Combs v. Plantation Patterns,* 106 F.3d 1519, 1532 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998)).

## III. *Title VII Disparate Treatment*

An employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e–2(a)(1). In individual disparate-treatment cases, such as this, plaintiffs have the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Combs,* 106 F.3d at 1527–28. If established, a legal presumption of unlawful discrimination arises, and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. (*Id.*). If the employer does so, the presumption is eliminated, and the plaintiff must be given an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by the defendant is a pretext for discrimination. (*Id.*). At all times, plaintiff retains the ultimate burden of persuading the finder of fact that defendant acted with discriminatory intent. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

### A. *Prima Facie Case of discrimination*

■ Where disparate treatment on account of sex is alleged, a *prima facie* case

state that she said that women were better than men at copier sales. (Danley Aff. ¶ 4; Hagaman Aff. ¶ 3).

of discrimination may be established either through direct evidence of discriminatory intent or, as is more often the case, through circumstantial evidence capable of supporting an inference of intentional discrimination. *See Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641–42 (11th Cir.1998). Evaluation of circumstantial evidence, on which plaintiff relies, is guided by the framework set forth in *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25. *Carter,* 132 F.3d at 642.

Generally, that framework requires plaintiff to show that (1) he is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) evidence by which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of sex, if the employer's actions remained unexplained. *See, e.g., Furnco Construction Corp. v. Waters,* 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Depending on the circumstances of the particular case, the forth element may require a showing that the plaintiff was replaced by an individual not from his protected class or that similarly situated individuals outside his protected class were treated differently. *See, e.g., Coutu v. Martin County Bd. of County Commr's,* 47 F.3d 1068, 1073 (11th Cir.1995); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984).

Plaintiff attempts to meet the fourth element of his *prima facie* case by showing that he was treated differently than similarly situated female employees; however, he fails in this attempt. The Eleventh Circuit recently reiterated that in order to show discrimination by a comparison to similarly situated employees, the plaintiff must show that he and the other employees are similarly situated in all relevant respects. *Jones v. Bessemer Carraway Medical Center,* 137 F.3d 1306, 1311 (11th Cir.1998). "In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Id.* (citing *Nix,* 738 F.2d at 1187).

Plaintiff has not shown that his performance and the performance of any female sales representatives are comparable within the meaning of these precedents. To satisfy his burden, plaintiff must demonstrate "that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained." *Nix,* 738 F.2d at 1185.

As an initial matter, the court notes that plaintiff makes several allegations in his affidavit that are not based on his personal knowledge. He contends that Ms. Villafara was consistently tardy, missed meetings and did not receive reprimands, that Turner did not use abusive language when speaking to female employees, and that female employees did not receive reprimands for failure to meet quota. Yet, plaintiff had no personal knowledge regarding the way Turner spoke to female employees outside his presence[6], or whether female employees were reprimanded for failure to meet quota, absenteeism or tardiness. (Pl.Dep. pp. 142, 146–7).

Similar allegations contained in the affidavits of former sales representatives Daniel Hagaman and Kevin Danley are also

---

**6.** The court will accept as within plaintiff's personal knowledge that Ms. Turner cursed and yelled publicly more frequently at him than she did at the one female employee who was under her supervision for more than a month. However, taken together with the other evidence of plaintiff's poor performance, this is only a scintilla of evidence of discriminatory animus and is insufficient to create a triable issue of fact.

without a proper foundation showing personal knowledge. Each of these men worked for defendant for a brief period of time, approximately eight weeks. Mr. Danley's employment did not overlap with Ms. Villafara's employment, and he was hired shortly before plaintiff was terminated. Neither man had access to personnel files or was in a position to know whether a woman had an excused or unexcused absence. Moreover, neither was in a position to know about other subjects contained in their affidavits, *e.g.*, whether Ms. Turner asked women to deliver copiers, reprimanded women, or gave more sales leads to women than to men.

As stated above, there were only two female employees supervised by Ms. Turner during the relevant time period. It is undisputed that Ms. Villafara performed poorly in April of 1996 and resigned by mutual agreement at the end of April after being under Ms. Turner's supervision for less than a month. Therefore, no inference of discrimination can be drawn from comparing plaintiff to Ms. Villafara.

Ms. Boyer's sales performance was better than plaintiff's and there is no evidence she was insubordinate. Therefore, no inference of discrimination can be drawn from the circumstances of her tenure with the defendant.

The court also considers the effect of Ms. Turner's alleged remarks that women were better than men at selling copiers and that men were inferior to women. Under some circumstances, stray discriminatory remarks can provide enough circumstantial evidence to create a *prima facie* case. *See Dickson v. Amoco Performance Prods.*, 845 F.Supp. 1565, 1569 (N.D.Ga.1994) ("In contrast to the law regarding stray remarks constituting direct evidence of discrimination, the law's recognition of discrimination claims based solely on circumstantial evidence evinces the legal possibility of stray remarks rising to the level of prima facie evidence of discrimination."). In this case, the alleged remarks were obviously related to sales performance. Sales performance, however, is capable of objective evaluation and evidence before the court demonstrates that plaintiff's performance was poor as compared to other employees. This evidence, therefore, is not sufficient to raise an inference of discriminatory intent.

Plaintiff makes several other allegations that he contends evidence discrimination. First, he points to his testimony that some of his signatures acknowledging the warning letters are forgeries. Accepting this as true, it is nevertheless undisputed that several of the warning letters came from managers other than Ms. Turner and that the letters dealing with plaintiff's failure to meet his sales quota are accurate. Therefore, the alleged forgery of plaintiff's acknowledgment signature on warnings contained in his personnel file does not evidence sex discrimination and the genuineness of his signature is not a material disputed fact.

Plaintiff also contends that his poor sales performance was due to Turner's discriminatory actions. In his deposition, he alleged that he had to split commissions with female salespersons on two occasions when he does not believe that the women deserved the commission. He does not, however, show that splitting the commissions was improper or point to any comparable situation where a woman did not have to split her commission with a man. Therefore, this allegation does not create an inference of discrimination.

For all of these reasons, plaintiff has not established a *prima facie* case of discrimination.

**B. *Prima Facie Case of Retaliation***

■ To establish a *prima facie* case of retaliation, plaintiff must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal connection exists between the two. *Jones v. Lumberjack Meats, Inc.*, 680 F.2d 98, 101 (11th Cir. 1982); *Donnellon v. Fruehauf Corp.*, 794

F.2d 598, 600–601 (11th Cir.1986). To satisfy the causal connection requirement, plaintiff must show "that the protected activity and the adverse action were not wholly unrelated." *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 920 (11th Cir.1993); *Simmons v. Camden County Board of Education,* 757 F.2d 1187, 1189 (11th Cir.), *cert. denied,* 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985). Plaintiff was called into a meeting in June 1996 by Cobb and Turner to discuss his job performance. Jim Price of PACC's Human Resources Department was also present. (Pl.Dep. p. 152). At the meeting, plaintiff was told that he needed to make immediate improvement in his performance. (Pl. Dep. p. 153). After Ms. Turner and Mr. Cobb left the meeting, plaintiff told Mr. Price that he felt that Ms. Turner was harassing him and discriminating against him because he is a man. (Pl.Dep. p. 155). He gave Price a copy of a document he prepared entitled "Letter of Concerns and History of Events With New Sales Manager" which contained, *inter alia,* allegations that Turner harassed him because he is a man.

■ Plaintiff alleges in his affidavit (¶ 22) that in August 1996, he complained to Turner and Cobb "verbally and in writing" that Turner was engaging in discriminatory conduct toward him and other male employees. Defendant points out that at his deposition, plaintiff stated that he had no meeting with Turner and Cobb after the June 1996 meeting. (Def Reply, p. 11, citing Pl.Dep. 155). However, even assuming plaintiff complained of discrimination in August 1996, a jury could not infer retaliation from the facts of this case.

■ The only factor in plaintiff's favor on the causal connection is that his termination followed his alleged complaints of discrimination. Although timing is often relevant to the causation element of a retaliation claim, *see Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993); *Donnellon,* 794 F.2d at 600–01, this court has clarified that temporal proximity,

standing alone, may not be sufficient to establish the causal link. *Robinson v. AFA Serv. Corp.,* 870 F.Supp. 1077, 1084 (N.D.Ga.1994). Specifically, while a short lapse of time might raise an inference of discrimination, such an inference does not arise when intervening factors are established. *See Robinson,* 870 F.Supp. 1077, 1084 (finding absence of causal link, despite termination one day after employer learned of plaintiff's discrimination charge, when defendant showed that plaintiff had been warned numerous times regarding her job performance). Other courts have adopted a similar view. *See, e.g., Gleason v. Mesirow Financial,* 118 F.3d 1134, 1147 (7th Cir.1997) (finding that the plaintiff's termination only a few weeks after she complained of certain conduct did not establish a reasonable inference of causation when the discharge closely followed a "significant and costly error"); *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3rd Cir.1997) ("[T]he mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events."); *Nelson v. J.C. Penney Co.,* 75 F.3d 343, 346 (8th Cir.), *cert. denied,* 519 U.S. 813, 117 S.Ct. 61, — L.Ed.2d — (1996) (finding no inference of causation when there was "considerable evidence" that supervisors reprimanded the plaintiff several times and gave him a final warning about his job status before they knew of his discrimination complaints); *Caudill v. Farmland Industries,* 919 F.2d 83, 86–87 (8th Cir.1990) (finding that the fact that plaintiff's termination followed closely his amendments to a discrimination complaint against a former employer did not support an inference of causation when the former employer had not objected to its subsidiary hiring plaintiff after he filed the initial complaint); *Booth v. Birmingham News Co.,* 704 F.Supp. 213, 215–16 (N.D.Ala. 1988) (holding that a short span of time created no reasonable inference of retaliation when the record contained "interven-

ing factors," i.e., other reasons for the adverse action arising after the protected activity), *aff'd without op.*, 864 F.2d 793 (11th Cir.1988).

It is undisputed that plaintiff failed to meet his sales quota for any of the months that he was supervised by Ms. Turner, that upon receiving a warning letter from Ms. Turner on September 4, 1996, he defiantly wadded it up and threw it away, and that he failed to make any sales in October 1996, his last month of employment. Also, plaintiff received warnings about his performance before his alleged protected activity; in fact, as plaintiff admits, the June meeting, wherein he first complained about discrimination, was called to discuss his poor performance. On these facts, an inference of causation will not arise simply from the temporal proximity between plaintiff's most recent complaint and his termination.

### C. *Defendant's Rebuttal of Prima Facie Case*

■ Even if plaintiff had established a *prima facie* case of either discrimination or retaliation, summary judgment for defendant would still be required. To defeat the presumption of discriminatory intent that arises with plaintiff's *prima facie* case, defendant must articulate a legitimate, non-discriminatory reason for the alleged discriminatory action. *McDonnell–Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Defendant's burden is "exceedingly light" and is "one of production, not proof." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir.1983). By relying on statements made by Turner in her October 30, 1996 letter, defendant satisfies this burden.

### D. *Plaintiff's Burden to Prove Pretext*

Because defendant successfully rebutted plaintiff's *prima facie* case, the burden shifts back to plaintiff to raise a genuine factual question as to whether defendant's proffered reason is mere pretext. *Hairston*, 9 F.3d at 920. Plaintiff can prove

pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Plaintiff, however, is not required to produce evidence beyond that already offered to establish the *prima facie* case; this evidence, "combined with effective cross-examination of the defendant," may be sufficient "to discredit the defendant's explanation and establish pretext." *Hairston*, 9 F.3d at 921 (internal quotation marks omitted). Nonetheless, "conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext of intentional discrimination where [an employer] has offered ... extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988) (quoting *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th cir.1987)).

As discussed above, plaintiff has not presented sufficient evidence to call into question the legitimacy of defendant's proffered reasons for his termination.

### IV. *Hostile Work Environment*

Hostile work environment harassment occurs when the employer or agent's "conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (internal quotations and citations omitted).

■ To succeed in his hostile environment claim, plaintiff must demonstrate that the actions of the defendants altered the condition of the workplace, creating an objectively abusive and hostile atmosphere. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993) (finding that "[w]hen the workplace is permeated with 'discriminatory intimi-

dation, ridicule, and insult' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' ... Title VII is violated"). This determination must be made by looking at all the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. at 371. The conduct must be more than a mere utterance or action "which engenders offensive feelings in an employee...." *Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ Applying this standard, plaintiff does not create a factual issue for a jury on whether he worked in a sexually hostile environment. The only incidents that were overtly related to plaintiff's sex were Ms. Turner's alleged statements that women were better than men at sales. At most, this is a mere utterance that engendered offensive feelings.

■ The other incidents about which plaintiff complains were yelling, discipline or other work-related actions with which he disagreed. Even if discipline, criticisms or work-related actions were unjustified or overly harsh or hostile, plaintiff would not necessarily have an actionable Title VII claim. Title VII does not guarantee a fair or pleasant working environment. General harassment which is not racial or sexual in nature is not actionable. *See, e.g., Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir.1994), *cert. denied,* 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995). In order for a jury to conclude that the facially neutral criticisms were sexually motivated, plaintiff would have to show that female employees were not criticized for similar conduct. *See Dudley,* 931 F.Supp. at 791. As discussed above, Plaintiff has not presented sufficient evidence for a jury to draw that conclusion.

For these reasons, defendant is entitled to summary judgment on plaintiff's claim of a hostile work environment.

## V. Intentional Infliction of Emotional Distress

■ Plaintiff contends that Ms. Turner's actions constitute intentional infliction of emotional distress. To establish a claim for intentional infliction of emotional distress under Georgia law, plaintiff must show that: (1) defendant's conduct was extreme and outrageous; (2) defendant acted with intent or reckless indifference; (3) plaintiff suffered severe emotional distress; and (4) the emotional distress was caused by defendant's conduct. *See Bridges v. Winn–Dixie Atlanta, Inc.,* 176 Ga.App. 227, 335 S.E.2d 445, 447–48 (1985).

■ Extreme and outrageous conduct is that which is "so terrifying or insulting as naturally to humiliate, embarrass or frighten." *Moses v. Prudential Ins. Co. of America,* 187 Ga.App. 222, 369 S.E.2d 541, 542 (1988). The standard is a difficult one because of "the court's justifiable concern that causes of action grounded upon emotional distress may give rise to fictitious, inflated, or trivial claims unless properly circumscribed...." *Id.* at 544. Therefore, a claim for intentional infliction of emotional distress requires more than an allegation that plaintiff was offended or insulted. *Kornegay v. Mundy,* 190 Ga.App. 433, 379 S.E.2d 14, 16 (1989).

■ Plaintiff contends that Ms. Turner's conduct towards him was extreme and outrageous. He contends that Ms. Turner screamed at him and insulted him in connection with things he did at work. While a reasonable jury could find that this behavior, if believed, was inappropriate, it does not rise to the level of extreme and outrageous conduct. "Liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities ... [p]laintiffs

must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Moses*, 369 S.E.2d at 544.

While the fact that the alleged inappropriate conduct occurred in an employment setting may "produce a character of outrageousness that otherwise might not exist," *Mears v. Gulfstream Aerospace Corp.*, 225 Ga.App. 636, 484 S.E.2d 659 (1997), the conduct of which plaintiff complains is not sufficiently severe to support a claim of intentional infliction of emotional distress even in an employment context. *See, e.g., Mundy v. Southern Bell*, 676 F.2d 503 (11th Cir.1982) (affirming summary judgment where allegations included threats by supervisor to "get" plaintiff and "destroy" his career, transfers to less desirable jobs, negative performance evaluation and attempt to damage plaintiff's reputation); *Fox v. Ravinia Club, Inc.*, 202 Ga.App. 260, 414 S.E.2d 243 (1991) (finding no outrageous conduct where plaintiff's supervisor spoke to her in a "hostile, intimidating and abusive manner" and gave false reasons for her termination).

Because plaintiff has not satisfied at least one element of a *prima facie* case of intentional infliction of emotional distress, summary judgment is appropriate on that claim.

## VI. *Conclusion*

For the above reasons, defendant's Motion for Summary Judgment [Doc. 28] is **GRANTED.**