Samuel D. BAKER, Plaintiff,

v.

ALABAMA DEPARTMENT OF PUBLIC SAFETY, Patrick Manning, Individually and in his official capacity of Chief, Highway Patrol Division, Alabama State Troopers, Department of Public Safety, State of Alabama; Jeff Standridge, Individually and in his official capacity as Captain, Alabama State Troopers, Highway Patrol Division, Department of Public Safety; and Clifford Nall, Individually and in his official capacity as Lieutenant, Alabama State Troopers, Highway Patrol Division, Department of Public Safety, Defendants.

No. CIV.A. 02–A–1049–N.

United States District Court,
M.D. Alabama,
Northern Division.

Dec. 19, 2003.

Jimmy L. DeBardelaben, DeBardelaben Norwood & Westry LLC, Montgomery, AL, for Samuel D. Baker, plaintiff.

William G. McKnight, Alabama Department of Public Safety, Legal Unit, Montgomery, AL, for Alabama Department of Public Safety, Patrick Manning, Individually and in his official capacity of Chief, Highway Patrol Division, Alabama State Troopers, Department of Public Safety, State of Alabama, Jeff Standridge, Individually and in his official capacity as Captain, Alabama State Troopers, Highway Patrol Division, Department of Public Safety, Clifford Nall, Individually and in his official capacity as Lieutenant, Alabama State Troopers, Highway Patrol Division, Department of Public Safety, defendants.

## MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment filed by the Alabama Department of Public Safety, Chief Patrick Manning, Captain Jeff Standridge, and Lieutenant Clifford Nall, ("Defendants") on July 15, 2003 (Doc. # 12).

Samuel D. Baker ("Plaintiff" or "Baker") filed his Complaint on September 9, 2002 bringing claims pursuant to 42 U.S.C. § 2000e et seq. ("Title VII") for race discrimination (Count I), retaliation (Count II), and harassment (Count III).

For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED.

### II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving

party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

The summary judgment rule is to be applied in employment discrimination cases as in any other case. *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir.2000)(*en banc*).

## III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movants:

In the State of Alabama, state troopers escort college football teams to games. Lieutenant Nall, who is black, wanted to be the trooper escort for the Alabama A & M football team, but Trooper Samuel Baker, who is also black, received the assignment. Plaintiff's Exhibit 3.[1] Thereafter

the relationship between these two men deteriorated; what once had been a friendship turned sour and adversarial.

Samuel Baker has worked for the Alabama Department of Public Safety since 1988. In 2001, when he wanted to be transferred out of the Alabama Bureau of Investigation, it was to Lieutenant Nall's post in Huntsville that he transferred. Shortly after starting in his new position, Baker expressed an interest in an obtaining an additional duty assignment as the escort for the Alabama A & M football team. Nall supervises twenty three troopers in three different counties. According to Nall, he was concerned that the other troopers would view any special duty assignment as being favoritism towards Baker, whom they knew to be a friend of his. Defendants' Exhibit 30 at p. 2. Besides, he thought that by allowing Baker to transfer into the Huntsville Highway Patrol, thereby enabling him to avoid any further discipline for an incident that occurred while he was with the ABI, Baker was already benefitting from a large enough favor. *Id.* Nall also felt that Baker should earn any special assignments over time through hard work and that seeking the escort assignment at this point was premature. *Id.* Thus, he allegedly instructed Baker to leave the football assignment alone. *Id.* Baker indicates that this was said in a joking manner, so he did not take the instruction seriously. Baker's Deposition at 92. Nall apparently had warned that "anybody who puts in for the A & M escort is going to be in for a bumpy ride" and asked Baker "if this A & M slot is worth all the heat I'm going to bring on

---

1. Although Nall admits to not wanting Baker to have the job, he denies wanting to be the trooper escort for the Alabama A & M football team. Nall insists that he did not want Baker to have that escort assignment, because of concerns about perceptions of favoritism and

a sense that Baker had not earned the position. The court for purposes of summary judgment analysis assumes throughout this opinion the validity of the Plaintiff's contention that Nall wanted the duty assignment.

you if you get it?" *Id.* Baker thought Nall was merely "kidding." *Id.*

Nall concedes that there were no written departmental guidelines on applying for the escort positions, thus technically any trooper was eligible to apply and Baker was as entitled as anyone else to do so. Defendants' Exhibit 30 at 3; Defendants' Exhibit 21 at 26. Nevertheless, Nall considered Baker's actions in ignoring his instructions and contacting Alabama A & M officials directly about the escort position to be insubordination. Defendants' Exhibit 30 at 3. Baker, who was aware that his orders regarding the escort position would be faxed into the Huntsville post, told Agent Price, a friend of his, to watch the expression on Nall's face when the letter arrived. Baker's Deposition at 100. Believing that Nall was kidding about not applying for the escort position, Baker says that he did this because he "was under the impression, at the time, that we were still playing." *Id.* 102. Price told Nall about Baker's suggestion. Nall interpreted Baker's statement as mockery; he felt that it undermined his authority with the other troopers. Defendants' Exhibit 30 at 25. Shortly after being informed of Baker's comment, Nall instructed Assistant Post Commander Gerald Kuntz to switch Baker from the day shift to the evening shift. Defendants' Exhibit 28 at 11. Nall also changed Baker's off day, his call sign, and required him to work a back to back shift that involved escorting the Alabama A & M team from Huntsville, Alabama to Baton Rouge, Louisiana. Baker's Deposition at 56;

That same day, Agent Pat Price, who is black, and Trooper Thomas Glenn Taylor, Jr., who is white, created a computer generated image of the Plaintiff's face superimposed onto an Arab terrorist. The image, which was designed like a television news broadcast display, indicated that "Montgomery [was] Under Attack" and identified Baker as a "Militant Leader" and a "Rebel with a Cause." Plaintiff's Exhibit 1. Nall received a copy of this image, which he placed on the bulletin board in his office. The amount of time that the image remained on Nall's bulletin board is disputed; the Plaintiff claims that it was posted for the entire month of October of 2001. Baker's Deposition at 60. He also asserts that Nall would bring people into his office to show them the image. *Id.* Captain Standridge, who was in Huntsville on a routine visit, noticed the picture of Baker depicted as a terrorist on Nall's wall. Standridge directed Nall to remove it, which he did.

Having come to the conclusion that Nall "was a very vindictive individual," Baker decided give up his position as the escort for the Alabama A & M team. Baker's Deposition at 107. Nall took the position for the remainder of the season, and the following year Trooper Summerville and Lieutenant Nall shared the assignment. *Id.* at 118. After surrendering the escort position, Baker requested to be placed back on first shift; Nall refused. He indicated that it was not yet time to return Baker to first shift. The Plaintiff went up the chain of command complaining to Captain Standridge. After discussing the Department's seniority system with other Troop Commanders around the State of Alabama, Standridge returned Baker to the first shift. Defendants' Exhibit 27 at 36–37. Standridge also placed a buffer between Baker and Nall in the form of Corporal Barnett, to whom the Plaintiff was to report.

On February 13, 2002, Baker filed an employee grievance with the Alabama Department of Public Safety regarding Nall's behavior and the Department's failure to take steps to protect him from Nall. The Department investigated Baker's complaint finding that Nall acted improperly,

but not finding a racial motivation. Defendant's Exhibit 7. The Department of Public Safety found that Nall did the following: (1) made inappropriate comments indicating an intention to retaliate against Trooper Baker when he sought and obtained an extra duty assignment, (2) changed Trooper Baker's permanent shift in retaliation, (3) scheduled Trooper Baker to work a shift from 2:00 p.m. to 10:00 p.m., before he would have to leave that same night for the A & M escort detail at 11:00 p.m., and (4) destroyed an official memorandum from Trooper Baker requesting an open assignment. Plaintiff's Exhibit 8. For these actions, Nall was suspended for three days. Defendants' Exhibit 7 at 5. On February 26, 2002, the Plaintiff filed a complaint with the Equal Employment Opportunity Commission. In his EEOC complaint, the Plaintiff argued that "[t]he harassment and retaliation started because Trooper Baker applied to be the State Trooper escort for [the] Alabama A & M football team. Apparently[,] Lt. Nall wanted the duty. Since Alabama A & M Trooper escorts are all black, this involves race discrimination." Defendants' Exhibit 3. In May of 2002, Baker also became a plaintiff in a wage and hour lawsuit against the Alabama Department of Public Safety.

On April 30, 2002, with its investigation of Baker's grievance completed, Colonel James Alexander, Director of the Alabama Department of Public Safety, notified Nall that he was being suspended for three days for his actions towards Trooper Baker. On May 3, 2002, Alexander contacted Baker by letter. Alexander noted that "[y]ou have indicated in your grievance that you anticipate problems in your assignment in the Huntsville Post. The department is prepared to reassign you to a different Highway patrol post, if you feel that actions taken do not address your concerns." Plaintiff's Exhibit 9. Apparently Baker had previously asked to be trans-

ferred to a vacant hearing officer position. Defendants' Exhibit 2. Baker did not respond to this letter. Baker's Deposition at 40. On September 3, 2002, Baker was called into Highway Patrol Division Chief Manning's office and was reassigned to Limestone County. Manning contends that he wanted to give Baker, who was having difficulties in Huntsville, a fresh start somewhere new. Defendants' Exhibit 29 at 3. The Plaintiff, however, believes that the transfer was a punishment. In being transferred to a trooper position in Limestone County, the Plaintiff did not have to change residences, for his home is not far from the Limestone County line. Baker's Deposition 147–148. His work hours start running before he crosses into Limestone County, for his time on duty starts counting as soon as he enters his state vehicle.

## IV.  *DISCUSSION*

The court addresses Baker's claims for race discrimination, retaliation, and racial harassment separately.

### A.  Race Discrimination

■ Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Where, as here, the Plaintiff seeks to prove intentional discrimination on the basis of race by using circumstantial evidence of intent, the court applies the framework first set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff must establish a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817. After the plain-

tiff establishes a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer does so, then the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence, to establish a prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *Combs,* 106 F.3d at 1534.

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Baker, who is black, alleges that he was discriminated against on the basis of race. An individual's opinion that he or she is the victim of discrimination on the basis of race is not sufficient, without further evidence, to establish a prima facie case of race discrimination. *Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir.1997). Nor will "mere conclusory allegations and assertions ... suffice" to establish the Plaintiff's prima facie case. *Earley v. Champion Intern. Corp.,* 907 F.2d 1077 (11th Cir. 1990).

Although Baker argues that he was clearly discriminated against on the basis of his race, he essentially concedes that the real source of his poor treatment was not prejudice, but personal animosity unrelated to the Plaintiff's race. In a charge of discrimination filed before the EEOC, the Plaintiff stated that "[t]he harassment and retaliation started because Trooper Baker applied to be the State Trooper escort for [the] Alabama A & M football team. Apparently L[ieutenant] Nall wanted the duty." Defendant's Exhibit 3. The Plaintiff's employee grievance expresses the same explanation: the "problems began" when "I was appointed as escort for the Alabama A & M football team.... [and] it turns out that my supervisor Lt. Nall wanted the vacant assignment." Plaintiff's Exhibit 3. This interpretation is reiterated in Baker's pleadings before this court, when he states that "in this case it is apparent that Nall ran Baker off the escort job so Nall could have the escort position." Plaintiff's Response to Motion for Summary Judgment at 11 ("Plaintiff's Response"). Furthermore, the Plaintiff argues that Nall's anger over the escort position is the reason that he required Baker to perform a back to back shift that involved escorting the Alabama A & M football team from Huntsville, Alabama to Baton Rouge, Louisiana. *Id.* at 13. The Plaintiff states that "Lt. Nall asked me 'Is the A & M detail worth all the heat that I'm going to bring on you if you get it?'" *Id.* The Plaintiff has determined in retrospect that if he could have foreseen the harm that would be caused by Nall's "thirst for revenge[,]" his answer would have been no. *Id.* Although the Plaintiff alleges that he was a victim of racial discrimination, he essentially concedes in his pleadings that Nall was motivated by anger over Baker taking the escort position for the Alabama A & M football team, not racial animus or bias.

In attempting to show a racial motivation, the Plaintiff also argues that the escort for Alabama A & M, a historically black college, has always been an African–American; however, it is unclear how this fact tends to show that Baker is the victim of racial discrimination. *Id.* at 9. The fact that the Plaintiffs' predecessors and successors as the trooper escort for the Alabama A & M football team including Nall are all African–Americans does not help demonstrate that the Plaintiff was the victim of racial discrimination. That the Plaintiff, who is an African–American, was replaced by another African–American, in a position that has always been held by African–Americans actually supports the conclusion that the Plaintiff was not discriminated against on the basis of race.

Nevertheless, the Plaintiff asserts that a portrayal of him as an Arab terrorist in a computer generated image on Nall's bulletin board, Nall's comment that he was "going to put me some color on second" shift when changing Baker's shift assignment, and Nall's differing treatment of white troopers, who escorted the University of Alabama football team, are sufficient to establish a prima facie case that he was the victim of racial discrimination. Plaintiff's Response 7–10; *see also* Baker deposition at p. 41, lines 13–14. As previously indicated, Baker has essentially conceded that Nall was not motivated by race in his conduct towards the Plaintiff. Consequently, even assuming that Nall made this comment and kept this picture posted, which the court does for purposes of summary judgment analysis, the comment and picture, though unsettling, are of no effect in analyzing Nall's intent.[2] Baker's comparison of his situation to that of white troopers, who escorted the University of Alabama's football team, fails to reference a similarly-situated party. To compare Nall's treatment of the Plaintiff with that

---

**2.** In his submissions to this court, Baker repeatedly indicates that Nall discriminated against him because of his anger with the Plaintiff over his receiving the Alabama A & M football escort position. The Plaintiff specifically admits that his shift schedule was adjusted because of taking the trooper escort position. The Defendant's counsel asked Baker, "were these shift changes brought about, you're saying, because of the fact that you were working the A & M escort detail?" Baker's Deposition at p. 59, lines 10–12. Baker's response, "Yes, sir." *Id.* at p. 59, line 13. Regardless of whether Nall, who also is black, made a statement regarding putting "some color" on the second shift, Nall did not discriminate on the basis of race, but instead because Baker took the Alabama A & M escort assignment. Baker deposition at p. 41, lines 13–14; p. 59, lines 10–13; *see also* Defendant's Exhibit 3; Plaintiff's Exhibit 3.

In the Plaintiff's reply brief, he poses the questions of why Nall moved Baker from the day shift to the night shift and why a poster of Baker depicted as a terrorist was placed on Nall's bulletin board? Plaintiff's Response Brief at 9. His answer is that Nall wanted the escort position for the Alabama A & M football team. *Id.* Repeatedly, the Plaintiff in his complaint and brief offers this explanation of Nall's behavior. For example, in his complaint and similarly in his response brief, the Plaintiff notes that Nall warned that anyone taking the Alabama A & M position would be in for a "bumpy ride" and that "[t]he day [the] Plaintiff was appointed as escort, Defendant Nall changed [the] Plaintiff from his first shift duty to permanent second shift, changed [the] Plaintiff's off-days and changed [the] Plaintiff's call sign." Complaint at ¶ 8; *see also* Plaintiff's Response at 8. The Plaintiff indicates that Nall "changed Baker's shift because Baker applied for the special detail with Alabama A & M and it was contradictory to what Nall suggested that Baker do." Plaintiff's Response at 3. Baker's reference to one comment that touches upon race that related to Baker being moved to the second shift, does not alter his overall argument that he presents to this court that Nall acted harshly to him out of anger over Baker taking the Alabama A & M trooper escort position. Furthermore, the Plaintiff's move to second shift was temporary and was corrected when he complained to Captain Standridge.

of the white troopers, who escorted the University of Alabama football team, the Plaintiff must show that he and the white troopers are similarly-situated in all relevant respects. *Holifield*, 115 F.3d at 1562.[3] In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. *Id.* There is no evidence submitted that Nall wanted the University of Alabama football escort position and had a white trooper take it in his place. Consequently, it is unnecessary for this court to even consider the additional distinctions raised by the Defendants, such as Baker's alleged insubordination in order to reach the conclusion that the white trooper escorts for the University of Alabama's football team are not similarly-situated. Regardless, as previously stated, the Plaintiff essentially concedes that Nall's motivation was personal animus, not race. Thus, the Defendants' Motion for Summary Judgment is due to be granted as to Baker's claim of racial discrimination.

### B. Retaliation

"[A] plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case; the plaintiff must show that (1) [he or] she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." *Little v. United Techs., Carrier Transicold Div.,* 103 F.3d 956, 959 (11th Cir.1997). Baker alleges that the ALDPS "retaliate[d] against him for filing his EEOC complaint and/or to retaliate[d] against him for be-coming a plaintiff in the wage and hour lawsuit filed against the Department of Public Safety . . . ." Complaint at para. 8. In responding to the Defendant's Motion for Summary Judgment, the Plaintiff also indicates that this retaliation occurred because "he was pursuing an additional duty assignment, which he had every right to do, to earn increased income due to increased work hours." Plaintiff's Response at 12.

The Plaintiff asserts that he became the victim of retaliation for a variety of reasons. Title VII's protections against retaliation do not, however, create an aegis or shield guarding against any and all retaliatory wrongs. The express statutory language prohibiting retaliation provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3; *see also Merriweather v. Alabama Dept. of Public Safety,* 17 F.Supp.2d 1260, 1273 n. 10 (M.D.Ala.1998). Thus, to satisfy the first prong of the prima facie case, an employee, who claims retaliation for opposing an employer's conduct, must have a good faith, objectively reasonable belief that such conduct was unlawful under Title VII. *Little v. United Techs. Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir.1997).

■ The court considers the substantive law at the time of the offense to assess the objective reasonableness of an employee's

---

**3.** As part of the Title VII plaintiff's prima facie case, the Plaintiff must show that his employer treated similarly-situated employees outside his classification more favorably than himself. *Coutu v. Martin County Bd. of Coun-ty Comm'rs,* 47 F.3d 1068, 1073 (11th Cir. 1995). If a plaintiff fails to show the existence of a similarly-situated employee, summary judgment is appropriate where no other evidence of discrimination is present. *Id.*

belief that he or she was the victim of unfair employment practices under Title VII. *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1187 (11th Cir.2001). To prevent the evisceration of the objectiveness requirement, plaintiffs are charged with knowledge of the substantive law. *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 n. 3 (11th Cir.1998). Pursuing the escort position for the Alabama A & M football team, against the wishes of his supervisor, who also wanted the position, cannot reasonably be regarded as protected activity under Title VII, which guards against discrimination on the basis of race, color, religion, sex, and national origin. 42 U.S.C. § 2000e–2. Baker's concession that Nall was motivated by a desire to get revenge for the Plaintiff taking a job assignment that Nall wanted removes any doubt as to whether the activity could reasonably be thought to fall within the protective sphere of Title VII. Simply stated, the Plaintiff's grievance against Nall does not relate to conduct that reasonably could be thought to violate Title VII. *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir.1986) (noting that "[p]ersonal animosity ... is not proscribed by Title VII.").

■ Nevertheless, the Plaintiff's filing of a wage and hour lawsuit and an EEOC claim constitute statutorily protected activity. *Blackie v. Maine*, 75 F.3d 716, 722 (1st Cir.1996); *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1117 (11th Cir.2001). The wage and hour lawsuit, however, does not fall within the protections of Title VII. Instead, the Plaintiff's participation in that lawsuit is protected under the anti-retaliation provision of the Fair Labor Standards Act. 29 U.S.C. § 215(a)(3). The prima facie case for retaliation under the FLSA corresponds with the requirements of Title VII. To demonstrate retaliation under the FLSA, the Plaintiff must show that "(1) she [or he] engaged in activity protected under [the] act; (2) she [or he] subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf v. Coca–Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir.2000). Even though the Plaintiff has failed to plead his claim for retaliation resulting allegedly from his participation in the wage and hour lawsuit under the FLSA, the court will, nevertheless, consider his argument as if he had made a claim under the FLSA and address the matter. Consequently, the court will address both retaliation under the FLSA for filing a wage and hour lawsuit, and under Title VII for filing an EEOC claim.

The same two problems confront both theories of retaliation, "retaliatory" conduct occurring before the statutorily protected activity and lack of adverse employment action. Almost all of the "retaliation" that Baker states he suffered occurred before he became a plaintiff in the wage and hour lawsuit against the Alabama Department of Public Safety in May of 2002 and before his EEOC claim in February of 2002. The Defendants' actions that occurred before the statutorily protected activities, as a matter of law and logic, cannot be retaliatory. *Smith v. Alabama Dept. of Public Safety*, 64 F.Supp.2d 1215, 1232 (M.D.Ala.1999). The only potential adverse employment actions that occurred after the filing of the EEOC claim or the wage and hour lawsuit are related to his transfer to Limestone County. Baker states that the retaliation that he suffered included being "transferred to Limestone [County] ... [and having to] adhere to different rules than other troopers" in his new post. Defendants' Exhibit 20 at p. 192, lines 8–10.

Transferring an employee to a different position or a different location can consti-

tute an adverse employment action for Title VII purposes. "In a Title VII case, a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility." *Hinson v. Clinch County, Georgia Bd. of Educ.,* 231 F.3d 821, 829 (11th Cir.2000) (citing *Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1448 (11th Cir.1998)); *see also Merriweather,* 17 F.Supp.2d at 1276. In assessing whether a transfer is adverse, the court uses an objective test, asking whether "a reasonable person in the plaintiff's position would view the employment action in question as adverse." *Hinson,* 231 F.3d at 829. Transfers that have required moving from one city to another have been held not be actionable where the transfer did not involve a change in salary, benefits, or any other aspect of employment. *Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir.1997); *Hoffman v. Rubin,* 193 F.3d 959, 964 (8th Cir.1999). Where the changed work location does not even require one to change residences, these transfers generally merely create an inconvenience, which for purposes of Title VII is not actionable. *Spears v. Missouri Dept. of Corrections and Human Res.,* 210 F.3d 850, 854 (8th Cir.2000) (*en banc*). For example, where the plaintiff's commute time increased from five or seven minutes to between thirty to forty minutes, the Tenth Circuit found that this constitutes a mere inconvenience and does not rise to the level of an adverse employment action. *Sanchez v. Denver Public Schools,* 164 F.3d 527 (10th Cir.1998).

Baker was transferred from Madison County to Limestone County, where he continued to work as a state trooper. He does not allege that there were any reductions in his salary or benefits. Baker actually lives close to the Limestone County line and his travel time to work is approximately the same, though it does take him a little longer. Regardless, Baker's travel time is included in his duty hours, thus he is paid from the moment that he enters his vehicle and begins driving towards Limestone County. Baker raises one specific objection to the location, which is that he is unable to make it home during his lunch breaks. This does not constitute an adverse employment action.

Baker raises a variety of objections to the rules that he must operate under in Limestone County. Baker complains that he had to work on second shift when he started in Limestone County and that his supervisor Lieutenant Pruitt imposed demanding standards in terms of requiring paperwork to be completed perfectly. The Plaintiff, however, provides no indication that Pruitt's method for determining seniority in shift assignments or demanding standards in terms of paperwork discriminated against Baker or constituted an abusive environment. In fact, Baker only remained on first shift for a month, before being placed into his preferred time slot. Baker also complains that initially he had to get permission to enter and leave Limestone County, which is a requirement not imposed on others. Troopers apparently have to notify their post when crossing county lines, thus Baker's objection is not to having to give notification, but to the idea that he had to get permission. This problem was never raised with Pruitt or any supervisor; nevertheless, the situation was corrected within two or three weeks. This treatment considered in its totality does not constitute an adverse employment action.

Baker's relationship with Nall had deteriorated to the point that the Plaintiff no longer wanted Nall to be his supervisor. Temporary steps were taken such as allowing Baker to report to Corporal Barnett instead of Lieutenant Nall, but Manning states that he wanted to give Baker a fresh start. Defendants' Exhibit 29 at 3. So, he moved Baker to Limestone County,

where there were no indications of any existing problems between Baker and his superiors. Baker believes that the transfer was a punishment. That Baker would prefer that it be Nall who is transferred to a different location is not surprising, but Baker being the one that is moved does not make the transfer an adverse employment action. Thus, the Defendants' Motion for Summary Judgment as to the issue of retaliation, both under Title VII and the FLSA, is due to be granted.

## C. Racial Harassment

To establish a prima facie case of hostile work environment racial harassment, Baker must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment "was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and (5) a basis for holding the employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999) (*en banc*) (setting forth the standards for hostile work environment sexual harassment); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n. 10, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (stating that "[h]ostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment."). As previously indicated, Baker essentially concedes that the harassment that Nall inflicted upon him resulted from personal animus, not racial prejudice. As for the conduct of Stanbridge and Manning, the Plaintiff argues that they were racially motivated in their failure to better discipline Nall. Baker, however, fails to provide comparators or any other evidence that Stanbridge's and Manning's failure to more effectively resolve his dispute with Nall was racially motivated. The only other behavior referenced by Baker that is arguably associated with racial harassment appears in the form of a computer generated image of the Plaintiff, with a copy posted on Nall's bulletin board, depicting him as an Arab terrorist. The image was created by Trooper Thomas Glenn Taylor, Jr., who is white, and Agent Pat Price, who is an African-American.

One, though not the only, obstacle to finding that this computer generated image provides adequate support for a claim of racial harassment is that this conduct is not sufficiently severe or pervasive to alter the terms and conditions of employment or to create a discriminatorily abusive working environment. The test for determining whether harassing conduct is sufficiently severe or pervasive incorporates both a subjective and objective component. *Mendoza*, 195 F.3d at 1246 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Subjectively, the employee must perceive the harassing conduct as being sufficiently severe or pervasive to alter the terms or conditions of employment. *Id.* This subjective perception must be objectively reasonable, considering all of the circumstances and being judged from the perspective of a reasonable person in the plaintiff's position. *Id.* (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). The fact intensive analysis of the objective component is guided by four factors: 1) the frequency of the conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with the employee's job performance. *Id.* (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

changes in the 'terms and conditions of employment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

According to Baker, an image of the Plaintiff with his face superimposed on a terrorist hung in Nall's office for approximately a month. Nall would bring people into his office to show the picture to them. Baker says that the experience was humiliating, especially with this occurring after the tragic events of September 11, 2001. Nall's actions in hanging up the picture on his bulletin board and showing it to others were unrelated to race, both in terms of their content and intent, thus his actions are irrelevant to the Plaintiff's racial harassment claim.

Consequently, only Taylor's and Price's actions are potentially relevant to Baker's racial harassment claim. The Plaintiff argues that white troopers do not have similar pictures generated of them in which they are depicted as terrorists and that Taylor would not have superimposed an image of a white trooper on a terrorist's body. Thus, Baker does not contend that the content of the photograph is racist towards him as an African–American; rather, his assertion is that he was harassed with this image because he is an African–American. Among this group of troopers, altering photographs to play jokes on co-workers was not unknown. Baker actually altered photographs of Dale Adams, a white friend of his who was retiring from the Alabama Bureau of Investigation. Baker's deposition at 63. Adams was superimposed onto other pictures to make it appear as if he were part of the crowd among a group of African–American civil rights demonstrators, a group of African–American children, who were singing, and a group of gay rights protesters. *Id.* at 63–64. Baker distributed these images at Adams' retirement party. *Id.* at 64.

Taylor, when questioned by the Plaintiff's counsel, indicated that he would not have created such a computer generated image of Mr. McKnight, Colonel Alexander, Major Hallford, Major Manning, or Captain Stanbridge, all of whom are white. Nevertheless, he created the image of Baker and stated that he might create such an image of Lieutenant Nall; both Baker and Nall are African–American. The Plaintiff infers from this that Taylor would have not created the images of McKnight, Alexander, Hallford, Manning, and Stanbridge because they are white, but he would create an image of Nall and Baker because they are black. Taylor offers another explanation. Taylor states that he created the image at the request of Agent Price, who is an African–American agent with the Alabama Bureau of Investigation. Defendants' Exhibit 22 at 11. The language on the picture referring to the Baker as a "militant leader," a "rebel for a cause," and the reference to "Montgomery Under Attack" were all created by Agent Price. Defendants' Exhibit 22 at 14; Plaintiff's Exhibit at 1. Baker offers no evidence to support the conclusion that Price was racially motivated. Taylor explains that the image was created as part of a practical joke. He was willing to create such an image of the Plaintiff, not because Baker is an African–American, but because the Plaintiff was a "practical joker," who had "played practical jokes" on both Price and Taylor. Defendants' Exhibit 22 at 17. Also supporting the conclusion that the inspiration for this image was a response to the Plaintiff's alleged rebelliousness, rather than his race, Taylor and Price created this image after Baker's conversation with Price regarding watching Nall's reaction to the Alabama A & M escort announcement. The inferential leap that the Plaintiff makes from Taylor's testimony that he would not have created a similar image of McKnight, the attorney

for the Defendants, or Alexander, Hallford, Manning, and Stanbridge, all of whom are high ranking officers within the Alabama Department of Public Safety, to the conclusion that Taylor was racially motivated is too great a step to be reasonably taken by this court under the facts presented.

Even assuming, arguendo, that Taylor and Price were racially motivated in their creation of this image, their actions do not rise to the level of altering the terms and conditions of employment. Their activities fall safely within the category of simple teasing and isolated incidents. *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275. Thus, the Defendants' Motion for Summary Judgment on the issue of racial harassment is due to be granted.

## V. CONCLUSION AND ORDER

For the reasons discussed above, the Defendant's Motion for Summary Judgment is due to be Granted as to all of the Plaintiff's claims, race discrimination, retaliation, and racial harassment. It is hereby ORDERED as follows:

1) Defendants' Motion for Summary Judgment is GRANTED.

2) Final Judgment will be entered in favor of the Defendants.

3) A separate judgement will be entered in accordance with this Memorandum Opinion and Order.

## FINAL JUDGMENT

In accordance with the Memorandum Opinion and Order entered on this day granting the Defendants' Motion for Summary Judgment, Judgment is hereby entered in favor of Defendants the Alabama Department of Public Safety, Patrick Manning, Jeff Standridge, and Clifford Nall, and against Plaintiff Samuel D. Baker. Costs are taxed against the Plaintiff.

